[Crim. No. 23536. First Dist., Div. Four. Jan. 6, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RHULIN LEE BLACKWOOD, JR., Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Diane M. Griffiths, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Herbert F. Wilkinson and J. Patrick Collins, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**POCHÉ, J.**—Rhulin Lee Blackwood, Jr., appeals from a judgment of conviction after a jury found him guilty of attempted escape from state prison. (Pen. Code, § 4530, subd. (b).) We affirm.

*Facts*

*The Prosecution's Case*

In January of 1981,[1] appellant was confined in the Central Facility of the Correctional Training Facility at Soledad.[2] Inmates housed in the Central Facility are not allowed beyond the fence which encloses it.

[1]Unless otherwise indicated, all dates refer to the 1981 calendar year.
[2]Soledad is divided into three separate facilities: Central, South and North.

On January 29, Samuel McCrea, a civilian culinary supervisor at Central Facility, was assigned to work on the culinary back dock and shipping and receiving. Appellant was assigned to assist him.

During the morning appellant and McCrea loaded a food truck with meat, bread and vegetables. The bread is loaded in a large, movable box or bin, with a lid, which is large enough to hold a man.

At 1:30 p.m., McCrea released appellant so that he could return to his wing for a close custody count. At that time appellant was no longer in the back dock, but was in the culinary section. Thereafter, McCrea loaded the bread bin into the truck.

Donald Cortelyou was the driver of the South Facility truck.[3] According to his preliminary hearing testimony, which was read to the jury, about 1:55 or 2 p.m., he drove the truck from the loading dock to the Central Facility's sallyport. There, the truck was stopped and searched for about 45 seconds. After Cortelyou had driven about halfway down Barracks Road he looked in his side view mirror and saw a head poke around the corner of his truck.

He stopped, got out, and walked to the rear of the truck, where he found appellant. Cortelyou asked appellant what he was doing. According to Cortelyou, appellant responded: "Man, you've got to let me go. I got too much time to do." Cortelyou told him to get into the cab so they could go to the farm gate and "talk it over." Appellant repeated his plea, but got into the cab without resistance.

After the truck began to move, appellant became "panicky" and tried to open the door from the inside. When he could not do that, he rolled down the window, opened the door from the outside and jumped out. Appellant then headed back down the road. Cortelyou continued driving toward the farm gate at South Facility to get help because he "figured we had a possible escapee." There he notified Mr. Thomas, who shortly thereafter took appellant into custody.

Francis Pomeroy, a correctional officer at Soledad, testified that at about 2 p.m., he was driving his car from South Facility to Central Facility on Circle Road. Pomeroy was wearing civilian clothing. As he rounded the corner, he was flagged down by a man—later identified as appellant—who was standing in the middle of the road.

---

[3]Cortelyou was a retired correctional officer who worked only 90 days a year at the prison.

The normal route for the food truck is as follows: The truck proceeds from Central Facility's back dock to the sallyport, a large fenced area with electronically sliding gates. After the truck is checked, it is directed through the sallyport and proceeds down Circle Drive to the intersection of Barracks Lane. The truck proceeds on Barracks Lane to the farm gate of South Facility, where it is checked again, and then is admitted to the South Facility compound.

After appellant entered the car Pomeroy recognized him as an inmate he had seen at Central Facility. Appellant told Pomeroy: "I was going to escape but I changed my mind. I'm turning myself in." Immediately thereafter, appellant was taken into custody.

*Defense case*

John Weaver, a program administrator at Soledad, testified that the Aryan Brotherhood is a white supremacy organization and that it had members or affiliates at the prison.

He recalled that on January 28, at about 4:15 p.m., appellant stopped him in the corridor near the Central Facility's dining hall. At that time, appellant expressed fear for his safety due to a pending transfer to San Quentin or Folsom. Neither Weaver nor appellant went into specifics because the conversation could be heard by others in the corridor. Weaver was not personally aware that appellant had had problems with the Aryan Brotherhood, but he testified that appellant's central file contained an entry from the reception center at Chino, which indicated that appellant had problems with the organization.

Appellant testified that on the day in question, while he was changing his clothing in the back dock area a man approached him and asked if his name was Blackwood. When appellant answered yes, the man said, "I understand you can tell me where I can get some apples and we need some apples in the sandwich room." Appellant then took the man to the vegetable room.

'When they entered the vegetable room, the man turned around and drew a knife. Appellant picked up a 25-pound bag of onions and threw it at him. He then screamed for help and ran from the room. According to appellant, because there was no one in the area to help him, and there was no way for him to escape the man, he jumped into the bread box and pulled down the cover to hide. Appellant testified that he had had other similar attempts on his life and that in each instance there was more than one person involved, so he "had reason to believe that there would be other enemies in the area."

Nothing happened after appellant jumped into the box. Later, he felt the box begin to move but he was afraid to investigate and find out who was moving it. After the box stopped moving, he could feel the truck begin to move. He knew that the truck would proceed to the sallyport to be searched. He thought at that time he could complain to the authorities about what had happened, and then he would be "secure and safe."

When the truck stopped at the sallyport, he did not get out, however, because he did not know where he was. He expected someone to look in the bread box.

About a minute after the truck began moving again, appellant peeked outside. When he saw that he was outside the perimeter of the Central Facility he leaned around the corner of the truck and waved at Cortelyou.

When Cortelyou stopped the truck, he told him what had happened. According to appellant, Cortelyou was "very evasive" and wanted to know whether appellant was an inmate. "He told me he thought that I was a free man. I told him, I said, no, I still got time, I still got time to do, and let's go, I wanted to turn myself in." Appellant testified that Cortelyou kept saying, "Something's not right here. What's going on?" He seemed "disoriented and like he didn't want to accept what was happening." Cortelyou suggested that they get into the truck, and asked appellant where his shoes were. Appellant told him that he had been accosted by an inmate while changing his clothes, and that his shoes were left behind in the Central Facility.

Cortelyou started driving in the direction of South Facility. Appellant told Cortelyou that he was going to turn himself in and got out of the truck. He started walking toward Central Facility and flagged down a car heading up Circle Road.

He admitted telling Pomeroy that he had planned to escape, and that he had changed his mind. Appellant explained what he meant by that statement: "Mr. Cortelyou acted like he didn't want to accept face value what was going on. I didn't want to get stuck with a—with being an escapee, you know, under that situation, and I knew it was important to turn myself in, which I had tried to do, and it seemed like he couldn't comprehend the situation. So what I meant by telling Mr. Pomeroy this was that now that he was here, I didn't have to go anywhere to turn myself in, I would—I was doing it."

Appellant denied that he intended to escape from the prison when he entered the bread box. He stated that all he wanted to do was to "escape the immediate danger" and that he planned to turn himself in at the sallyport. Appellant denied telling Cortelyou that "You've got to let me go. I've got too much time to do." Appellant could not understand why Cortelyou would say that because he was scheduled to be paroled the following year.

Appellant thought that the inmate with the knife was a member or an affiliate with the Aryan Brotherhood. He did not know his name, but had seen him in the exercise yard and in the kitchen area. He thought that the group had bad feelings toward him because he would not smuggle narcotics for them. He had complained to the authorities about the situation.

*The Former Testimony of Cortelyou*

Over defense objection the People were allowed to introduce into evidence the transcript of Cortelyou's preliminary hearing testimony.

One of the prerequisites to the introduction of prior testimony is that the hearsay declarant be shown to be "unavailable" as a witness. (Evid. Code, § 1291.)[4] Unavailability may be established by showing that the declarant is "[a]bsent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process." (§ 240, subd. (a)(5).) ▉ Unavailability of a witness is a preliminary fact which must be established by the proponent of the evidence to the satisfaction of the trial court. (§ 405; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) The trial court's finding on that issue will not be disturbed on appeal unless an abuse of discretion is shown. (*People* v. *Williams* (1973) 9 Cal.3d 24, 35 [106 Cal.Rptr. 622, 506 P.2d 998].)

The trial court found that the prosecution had sustained its burden of showing unavailability by the introduction of the following evidence:

David Peterson, an investigator at Soledad and the coordinator between the prison and the Attorney General's office with respect to prosecution of prison crimes, testified that on June 2, he received a subpoena for Cortelyou dated June 1. He called Cortelyou's residence telephone number without success and then mailed the subpoena to that address.

On June 3, Peterson telephoned the residence number again and learned from a neighbor who answered that Cortelyou and his wife were touring Alaska in their private vehicle and trailer. The woman did not know their itinerary, but expected them to return about mid-June.

On June 15, the date set for trial, Peterson appeared in the trial court on the prosecution's motion to admit the former testimony of Cortelyou, and was instructed to locate him. At that time, the trial court granted a continuance of the trial until July 1. Later that day, Peterson went to Cortelyou's residence and interviewed two neighbors. One informed him that Cortelyou was driving a green 1972 Ford station wagon with a trailer. The other told him that the Cortelyous had driven to Seattle to begin a bus tour of several Alaskan cities. She expected them to return around mid-July.

The next morning, Peterson informed the Alaska State Troopers of his problem in locating the Cortelyous. They agreed to put out an all-points bulletin.

---

[4]Unless otherwise indicated, all further statutory references are to the Evidence Code.

On June 17, Peterson contacted a friend of Cortelyou's but was offered no useful information.

On June 18, one of Cortelyou's neighbors told Peterson that the Cortelyous had a son in the Bay Area. Peterson then reread Cortelyou's personnel records at the prison to locate next of kin. He also contacted, without success, nine travel agencies in Seattle and four in Salinas where Cortelyou lived.

On June 22, Peterson received word in his San Francisco office that Cortelyou had telephoned Soledad that morning after being contacted by the Royal Canadian Mounted Police. He was advised to telephone Cortelyou at 4:30 that afternoon at the Klondike Inn in Whitehorse, Yukon Territory. Peterson contacted Cortelyou at 4:20 p.m. and requested him to appear at the trial set for July 1. Cortelyou said he was unable to return because he could not leave his wife and the luggage. Peterson told him that they would pay for his flight down and return. Cortelyou replied that his car had been demolished en route in Grants Pass, Oregon, and that therefore they had been unable to take a private tour of Alaska. He stated that he would be continuing his tour until June 25, when he would stay in the Braniff Hotel in Juneau. On June 26, they planned to board a ship which would dock in Seattle on June 29 or 30. Peterson asked Cortelyou if he would fly down on July 1 for trial. Cortelyou refused to leave his wife alone with the luggage in Seattle.

On June 25, Peterson telephone Cortelyou at his hotel in Juneau. Cortelyou again refused to return for the trial.

Peterson testified that he did not have any idea prior to June 2, that Cortelyou had planned a vacation.

The court took judicial notice that appellant's arraignment took place on May 6, and that during the preliminary hearing, Cortelyou stated that he was a 90-day temporary employee of Soledad. It was stipulated that the prosecution did not seek an interstate subpoena.

■ The trial court erred in finding that Cortelyou was unavailable.

The prosecution, the proponent of this evidence, did not establish that it "ha[d] exercised reasonable diligence but ha[d] been unable to procure his attendance *by the court's process.*" (§ 240, subd. (a)(5), italics added.) What the prosecution showed· was diligence, but not with respect to obtaining Cortelyou's attendance by the court's process. ■ The term "court's process" under section 240, subdivision (a)(5), includes interstate process under the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (Pen. Code, § 1334 et seq.). (*People* v. *Nieto* (1968) 268

Cal.App.2d 231, 235-241 [73 Cal.Rptr. 844]; *People* v. *Joines* (1970) 11 Cal.App.3d 259, 266-267 [89 Cal.Rptr. 661]; *In re Terry* (1971) 4 Cal.3d 911, 930-931 [95 Cal.Rptr. 31, 484 P.2d 1375]; *People* v. *Masters* (1982) 134 Cal.App.3d 509, 523 [185 Cal.Rptr. 134].) The uniform act was in force in California and in both Alaska and Washington at the time in question. (See § 1334 et seq.; Alaska Stats., §§ 12.50.010-12.50.080; Wash. Rev. Code Ann., §§ 10.55.010-10.55.130.)

■ It is neither an answer nor a fulfillment of the requirements of the Evidence Code to suggest, as the People do, that the prosecution was not required to obtain interstate process because most likely neither Alaska nor Washington would have issued a subpoena due to the undue hardship to Cortelyou. A guess by the prosecutor, the trial court or an appellate court about what the courts of Alaska or Washington might have done if requested to issue a subpoena for Cortelyou pursuant to the uniform act simply does not satisfy the requisite showing of *inability* under section 240, subdivision (a)(5). The prosecution's duty was to invoke the uniform act, not to decide whether such action would be fruitful. (See *In re Terry, supra,* 4 Cal.3d at pp. 930-931.) " '[T]he possibility of a refusal is not the equivalent of asking and receiving a rebuff.' " (*Barber* v. *Page* (1968) 390 U.S. 719, 724 [20 L.Ed.2d 255, 259, 88 S.Ct. 1318]; see also *Ohio* v. *Roberts* (1980) 448 U.S. 56, 76 [65 L.Ed.2d 597, 614, 100 S.Ct. 2531].)

To the People's alternate contention that there was not enough time to secure such process, the answer is the same. The prosecution's burden under section 240, subdivision (a)(5) is to demonstrate that it "exercised reasonable diligence but has been unable to procure [the absent declarant's] attendance by the court's process." Reasonable diligence demands that the attempt be made to secure process under the uniform act. Only if it *in fact* becomes impossible to secure the process, has the prosecution sustained its burden. No such showing was made.

Although the prosecution tracked down its missing witness and offered to pay his expenses in returning to California to testify it failed to make any attempt to use the uniform act to obtain a subpoena for compelling his return. Where the prosecution knows of the witness's location and procedures exist to bring the witness to court, section 240, subdivision (a)(5) requires those procedures be employed. Since the prosecution did not do so it was error for the trial court to permit the reading of Cortelyou's prior testimony at appellant's trial, and that error was of constitutional dimension. (*In re Terry, supra,* 4 Cal.3d at p. 931.)

■ However, we find the effect of that error to be harmless beyond a reasonable doubt. The absent witness, Cortelyou, was not the only witness against appellant. Pomeroy's testimony included the damaging admission by

appellant when he entered Pomeroy's car. Appellant himself admitted at trial that he made that statement to Pomeroy, and his explanation of it was less than persuasive. The error in admitting the former testimony therefore does not require reversal.

*The trial court did not err in rereading only CALJIC Nos. 6.00 and 6.01 in response to a jury note requesting reinstruction on abandonment of attempt.*

Prior to deliberations, the trial court gave the jury the following instructions on attempt: (1) CALJIC No. 6.00 (Attempt—Defined); (2) CALJIC No. 6.01 (Abandonment of Attempt—When Not a Defense); and (3) CALJIC No. 6.02 (Abandonment of Attempt—When a Defense).[5]

During deliberations, the jury sent the judge a note requesting further instruction. The actual note is not in the record.[6] The transcript reflects the following facts about the note: "THE COURT: . . . The Court has received a note regarding the instruction on abandonment of attempted escape. The Court will read you the instruction that the Court feels applies." The court proceeded to reread CALJIC Nos. 6.00 and 6.01, but did not reread CALJIC No. 6.02. The court asked the jury if it wanted any more instructions read. There was no answer.

Appellant contends that it was prejudicial error for the court to fail to also reread CALJIC No. 6.02: when abandonment of attempt is a defense. In his view, this selective "rereading of the abandonment instruction improperly placed undue emphasis on the prosecution's view of the case."

---

[5]CALJIC No. 6.00 reads: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission. [¶] In determining whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt; but acts of a person who intends to commit a crime will constitute an attempt where they themselves clearly indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design."

CALJIC No. 6.01 reads: "If a person has once committed acts which constitute an attempt to commit a crime, he cannot avoid responsibility by not proceeding further with his intent to commit the crime, either by reason of voluntarily abandoning his purpose or because he was prevented or interfered with in completing the crime."

CALJIC No. 6.02 reads: "If a person intends to commit a crime but, before he commits any act toward the ultimate commission of the crime, he freely and voluntarily abandons his original intent and makes no effort to accomplish it, the crime of attempt has not been committed."

[6]Appellant requested augmentation of the record with the note. The clerk of the superior court has informed this court that after searching the file and exhibit envelope, he is unable to locate the note.

It is appellant's burden to affirmatively demonstrate error by an adequate record; error is never presumed. (*Rossiter* v. *Benoit* (1979) 88 Cal. App.3d 706, 712 [152 Cal.Rptr. 65]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 373, p. 4345.) That burden has not been sustained here. Because the only evidence in the record is the trial court's interpretation of the jury request for reinstruction, it is simply not clear whether the jury wanted reinstruction on abandonment in general or whether it *only* wanted reinstruction on when abandonment is not a defense. In the absence of an affirmative showing that the trial court erred in rereading the instructions to the jury, there simply is no error for this court to review.

The judgment is affirmed.

Rattigan, Acting P. J., and Moscone, J.,* concurred.

A petition for a rehearing was denied January 31, 1983, and appellant's petition for a hearing by the Supreme Court was denied March 29, 1983.

---

*Assigned by the Chairperson of the Judicial Council.