Filed 3/1/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ALFRED FOY,<br><br>        Defendant and Appellant. | A141073<br><br>(Solano County<br>Super. Ct. No. VCR213746) |

Alfred Foy was convicted by a jury of seven counts of second degree robbery (Pen. Code, § 211)[1] and one count of possession of a firearm by a convicted felon (former § 12021, subd. (a)(1)). Foy was sentenced under the three strikes law to a term of 120 years to life in state prison. On appeal, Foy contends: (1) the trial court's admission of a witness's conditional examination testimony violated the confrontation clause of the Sixth Amendment; (2) the trial court abused its discretion by declining to conduct an evidentiary hearing on alleged juror misconduct; and (3) his aggregate sentence of 120 years to life constitutes cruel or unusual punishment. We agree that Foy's Sixth Amendment rights were violated and reverse the judgment.

### I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

Foy and codefendant Koshawn Rackley were charged by information with seven counts of second degree robbery (§ 211; counts one through seven), and one count each of possession of a firearm by a convicted felon (former § 12021, subd. (a)(1); count

---

[1] Undesignated statutory references are to the Penal Code.

[2] Our statement of facts includes the witness's conditional examination testimony.

1

eight). As to the robbery counts, it was alleged that both defendants personally used a firearm (former §§ 12022.5, subd. (a), 12022.53, subd. (b)). It was further alleged that Foy had suffered three prior robbery convictions (§ 211), which were alleged as serious felony enhancements (§ 667, subd. (a)(1)) and strike priors (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

The case was assigned for jury trial, which began on July 10, 2012. On July 26, 2012, the jury convicted Rackley of all counts and found the firearm allegations against him true. However, the jury deadlocked on all charges against Foy, and the court declared a mistrial. The case was assigned for retrial in July 2013. Foy agreed to bifurcate and waive jury trial on the prior conviction allegations.

*Prosecution's Case*

On November 18, 2011, Kenneth Henderson was working as an assistant manager at a Jack in the Box restaurant located at 35 Admiral Callahan Lane in Vallejo. At about 8:00 p.m., he was taking an order at the front counter when two African-American men entered the restaurant with handguns. Once inside the restaurant, the two men separated. The taller of the two men, who appeared to be about six feet tall and wearing a black hooded sweatshirt, gloves, and a red bandanna over his face, jumped over the front counter and grabbed Henderson by the back of his collar. The shorter man also wore a dark hooded sweatshirt, gloves, and a red bandanna over his face.

The shorter of the two men robbed the customers seated in the restaurant's dining area. Helen Buenviaje was seated in the dining area and checking her voicemail when she heard someone say, "Give me your phone." When Buenviaje failed to respond, the person repeated the demand. Buenviaje looked up and saw a man standing next to her, holding a gun to her head. She complied with his demands for her cell phone and to get down on the floor.

Shengkai Wang, Mengxia Zhou, and two female friends, Mengqiong Song and Yue Xu, stopped to eat at the restaurant on their way to Lake Tahoe. They were sitting together in the dining area when the two armed men entered the establishment. Wang and his friends complied with orders to get under the table. One of the men pointed a gun

2

at Wang's head and said, "Give me your phone." Wang lied and said he did not have a phone. The man also pointed a gun at Song and took her purse, along with Xu's. Each purse contained, among other items, an iPhone and an iPad.

Shana Dees was working at the restaurant's drive-through window when she heard loud noises coming from the lobby. She walked over and saw the taller man standing behind the front counter with his back towards her, and the shorter man in the dining area holding a gun to the head of an older female customer. The taller man turned around and called out to Dees, "Hey, little mama, hey, hey." At this point, Dees noticed that the taller man was holding Henderson by the collar and pointing a gun at his neck. The taller man said, "Everybody needs to get in the freezer now."

With his gun to Henderson's neck, the man directed several restaurant employees, including Henderson, Dees, Yadwinder Hans, Octavio Ramirez, Taleah Watson, and a person named Marcus, into the freezer towards the back of the restaurant and demanded their cell phones. Dees, Hans, and Ramirez handed over their phones. Meanwhile, the shorter man directed customers into the restrooms.

The taller man brought Henderson out of the freezer and told him to open the cash registers. Henderson complied, and the man removed the money from two cash registers—one located at the front counter and the other in the drive-through area. Each register contained a minimum of $150. At some point, the shorter man joined the taller man at the back of the restaurant, and the latter told the former to "[p]ut the heat on [Henderson], to let him know we're serious." The shorter man then put his gun to Henderson's neck, while the taller man asked Henderson where the safe was located. Henderson said it was in the office but that he did not have a key to the office door. The men returned Henderson to the freezer with the others. A few minutes later, Henderson realized the armed men were gone. He left the freezer and locked the front doors. He noticed a green Mitsubishi Mirage leaving the parking lot.

3

The police were called and arrived at the scene within minutes. Henderson showed them a video of the robbery from the restaurant's surveillance system.[3] He also told the police about the green Mitsubishi Mirage he saw fleeing the scene. The police received a description of the suspects as two African-American males, both wearing black hooded sweatshirts, blue jeans or dark colored pants, gloves, and red bandannas. The description of the suspects and suspected getaway car was broadcast to other officers.

Wang had an application on his iPhone called "Find My iPhone," which he used at the suggestion of police to track Song's stolen iPhone. Wang's phone displayed a map indicating that Song's phone was located at 603 Grant Street, a residence on the southwest corner of Lemon and Grant Streets in Vallejo.

Police officers responding to 603 Grant Street saw a green Mitsubishi Mirage parked in front of 622 Grant Street. The hood of the car was still hot and was making popping noises. It had recently rained, and the ground underneath the car was wet. The officers also saw an African-American male, later identified as Rackley, walking in the backyard of 603 Grant. He was ordered to "come out." Before he did, Rackley was seen placing an item on the ground. The item was an iPad. The police found another iPad with a pink cover inside the garage. Rackley was handcuffed and placed in the back seat of a patrol car. At the time, he was wearing a tee-shirt and blue jeans, as well as black shoes similar to those worn by the taller suspect in the surveillance video.

When Rackley was searched, the police found cash exceeding $600 in his jeans pockets (over $400 in one pocket and over $200 in another), two cell phones (one was an iPhone), and a set of keys. The bills were jammed haphazardly in Rackley's pockets. It was determined that the iPhone belonged to Song. The other phone belonged to Rackley and contained a photograph of a Smith & Wesson semiautomatic pistol with several magazines, and a photograph of a pistol and a red bandanna.

---

[3] The video was shown to the jury.

One of the keys was to a Chevrolet Cobalt parked in front of 609 Grant Street. When the Cobalt was searched, the police found a Samsung cell phone, with its battery removed, on the front passenger seat. The phone was used by Foy, but registered to Foy's teenage daughter.[4] On the backseat, the police found a lunch box containing a nine-millimeter bullet and a wallet that contained Rackley's driver's license and identification card. Inside the trunk, the police found one black hooded sweatshirt, a pair of black gloves, a red bandanna, a black beanie, a pair of black shoes with white soles, and a loaded semiautomatic Smith & Wesson handgun, which was similar to the handgun observed in the restaurant's surveillance video.

After Rackley was apprehended, the police heard more noises coming from the backyard of 603 Grant. It sounded as if someone was jumping a fence.[5] Moments later a police officer saw Foy, who is several inches shorter than Rackley, walking through the backyard around the corner from 603 Grant, at 603 Lemon Street. The officer announced himself and shined his flashlight. Foy looked at the officer and fled. After an extensive search, Foy was apprehended in the backyard of 631 Sonoma Boulevard. Foy struggled with several officers and a police dog before he was handcuffed. At the time of his arrest, Foy had no shirt on and, after his struggle with the police dog, his pants were down around his legs. Medics responding to the scene removed Foy's clothing.

Vallejo Police Officer Robert Greenberg transported Henderson, Song, and Xu from the restaurant to the intersection of Lemon Street and Sonoma Boulevard, where Foy was being loaded onto a gurney. Only Henderson went close enough to look at Foy, but he was unable to identify Foy as one of the robbers. Greenberg searched Foy's clothes and removed cash and a computer flash drive from Foy's pants pockets.[6]

---

[4] A photograph of black shoes with white soles was located on the phone.

[5] A car also pulled out of the garage at 603 Grant. The car's occupants—a male and a female—were detained by police.

[6] Another nearby officer saw items removed from Foy's pockets, but did not recall seeing a computer flash drive.

Greenberg found $161 in Foy's right front pants pocket and $18 in his left front pants pocket. The bills in both pockets were balled up. Henderson, Song, and Xu were also unable to identify Rackley. However, Henderson identified a nearby green Mirage as similar to the one he saw driving away. Xu and Song identified two iPads and an iPhone.

Cell phone records showed that on the day of the robbery several phone calls were placed between the phones used by Foy and Rackley. The records also showed that Foy's phone used different Vallejo cell phone towers during the calls, which could indicate that the phone was either moving or equidistant from two towers of varying strengths. Between 7:39 p.m. and 7:59 p.m., the number associated with Foy's phone stopped responding to cell phone towers, indicating the phone had been turned off or the battery had been removed.

The videotaped testimony of Song, taken at a conditional examination conducted on June 14, 2012, was played for the jury. Song testified she moved to Connecticut in March 2012, and was in California to attend her graduation at Stanford University. Song testified that she and Xu accompanied the police to two locations after the robbery. At the first location, the police showed the women a flash drive. At the conditional examination, Song was unable to recognize the flash drive from its appearance. However, when she was shown the drive's content, she recognized it as a classmate's math homework that had been shared with Xu.

*Defense Case*

Foy testified in his own defense and acknowledged he had four prior felony convictions that involved moral turpitude. He denied participating in the Jack in the Box robbery. At about noon on the day of the robbery, Foy went to his brother's house at 603 Grant Street. He was wearing gray jeans, a white tee-shirt, and a black and white checkered jacket. Foy met Rackley two weeks prior to the day of the robbery. On November 18, the two exchanged several calls relating to their plans to meet so Foy could buy "some CDs and stuff." Rackley arrived at 603 Grant Street at about 6:00 or 7:00 p.m.

6

Foy met Rackley outside. They sat and talked in Rackley's car, a Chevrolet Cobalt. Foy sat on the edge of the passenger-side seat with the door open, smoking marijuana. Foy was playing a video game on his cell phone when it froze. Foy removed the phone's battery in an attempt to reset it, and put the phone down on the seat. After about 20 minutes, Rackley got out of the car and left with a female friend who arrived in a different car. Foy walked back inside his brother's house, but left his phone in Rackley's car.

About 10 minutes later, Foy walked to the house located around the corner at 603 Lemon Street. While on his way back to his brother's house, Foy saw Rackley and two other men walking towards the open trunk of Rackley's Chevrolet Cobalt. One of the people with Rackley was named Dee. Foy invited Rackley and Dee into his brother's garage. Foy went inside the house, while Rackley and Dee stayed in the garage. Rackley's other companion left.

When Foy noticed several police cars pull up, he ran out the back door and jumped over the fence to 603 Lemon Street. When the police spotted him, Foy continued running. Foy ran because he was scared. He was on parole at the time and had been smoking marijuana. He did not want to go to jail. As he ran, Foy removed his jacket and shirt so that the officers could see he was unarmed. Eventually, a police officer ordered Foy to stop and put his hands in the air, and Foy complied. He denied resisting the officers. Foy asserted he was kicked, struck in the head, shocked with a Taser gun, and bitten by a police dog despite complying with police instructions.

On cross-examination, Foy acknowledged living close to the Jack in the Box at 35 Admiral Callahan Lane and having patronized it in the past. When he was arrested, he testified he had $161 in his wallet and $18 in his pocket. His wallet also contained a receipt, dated two weeks earlier, from the Jack in the Box at 35 Callahan Lane.

### Verdict

The jury convicted Foy on all counts and found true the allegations that he personally used a firearm. After a bench trial, the court found the prior conviction allegations to be true. Foy filed a motion for new trial, alleging juror misconduct. He

also filed an application, pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, inviting the court to exercise its section 1385 discretion and dismiss his strike priors. The trial court heard and denied both motions.

Foy was sentenced to consecutive terms of 40 years to life each on counts one, two, and six—consisting of a 25-year-to-life third strike term, a 10-year firearm enhancement (former § 12022.53, subd. (b)), and a five-year serious felony enhancement (§ 667, subd. (a)(1)). Foy was also sentenced to concurrent 40-years-to-life terms on counts three, four, five, and seven, as well as a concurrent three-year term on count eight (felon in possession of a firearm). The aggregate term of Foy's sentence is 120 years to life. This timely appeal followed.

## II.    DISCUSSION

As previously noted, Foy contends on appeal: (1) the trial court's admission of Song's conditional examination testimony violated the confrontation clause of the Sixth Amendment; (2) the trial court abused its discretion by declining to conduct an evidentiary hearing on alleged juror misconduct; and (3) his aggregate sentence of 120 years to life constitutes cruel or unusual punishment. We agree that the judgment must be reversed because the People failed to demonstrate Song was constitutionally "unavailable." Accordingly, we need not express our views on Foy's other arguments.

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. (*Barber v. Page* (1968) 390 U.S. 719, 725; [citation].) California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as

8

due diligence) in its unsuccessful efforts to locate the missing witness. (Evid. Code, § 240, subd. (a)(5) . . . .)"[7] (*People v. Cromer* (2001) 24 Cal.4th 889, 892.) In this respect, "[t]he constitutional and statutory requirements are 'in harmony.' [Citation.] The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable." (*People v. Smith* (2003) 30 Cal.4th 581, 609.)

On review we defer to the trial court's factual findings that are supported by substantial evidence, but we "independently review whether the facts demonstrate prosecutorial good faith and due diligence." (*People v. Herrera* (2010) 49 Cal.4th 613, 623 (*Herrera*).)

A.     *Background*

Foy's original trial was set to begin on July 10, 2012. Approximately five weeks before trial, the People sought to conditionally examine Song, stating she had recently moved to Connecticut but would be in California for a few days to attend her graduation ceremony, and had no plans to return after June 18, 2012. The trial court granted the People's application. Accordingly, on June 14, 2012, Song was sworn and testified at a videotaped conditional examination. Foy attended the conditional examination and his counsel cross-examined Song. At the first trial, Song's conditional examination testimony was admitted without objection. Foy's trial counsel stated, "That was kind of the idea."

---

[7] Evidence Code section 240 provides in relevant part: "(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is any of the following: [¶] (1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant. [¶] (2) Disqualified from testifying to the matter. [¶] (3) Dead or unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity. [¶] (4) Absent from the hearing and the court is unable to compel his or her attendance by its process. [¶] (5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process. [¶] (6) Persistent in refusing to testify concerning the subject matter of the declarant's statement despite having been found in contempt for refusal to testify."

In advance of the second trial, however, Foy opposed the People's motion to admit Song's conditional examination testimony. Foy argued the People had failed to show Song's unavailability under the Sixth Amendment standard. The People, on the other hand, maintained Song's examination testimony was admissible without a showing of due diligence under section 1345 and *People v. Thompson* (1998) 61 Cal.App.4th 1269 (*Thompson*).

At the hearing on the motion, the People insisted there was no obligation to show due diligence because Song was unavailable by virtue of living out of state. Foy's trial counsel disagreed, urging the court to examine Song's availability under the standards set by the Sixth Amendment. Specifically, he argued: "The confrontation clause requires that [a witness] be unavailable using a constitutional standard for unavailability, and it does require due diligence on the part of the prosecution. And . . . waiting a whole year and just assuming that because it was [admitted] once it could be done again, fails to meet the requirements. [¶] I think under the cases that I've cited . . . the [Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (Uniform Act; § 1334 et seq.)] needed to be utilized here . . . ."[8]

_____

[8] "Under the Uniform Act, as adopted in California, when a person located in a sister state that has also adopted the Uniform Act is a 'material witness' in a 'prosecution pending in' California, the judge of the court in which the prosecution is pending 'may issue a certificate . . . specifying the number of days the witness will be required,' which 'shall be presented to a judge of a court of record in the county of such other state in which the witness is found.' ( . . . § 1334.3, subd. (a); [citation].) . . . [¶] Under the Uniform Act, a sister state court that receives a certificate described in the preceding paragraph must direct the witness named on the certificate to appear at a hearing. ( . . . § 1334.2; [citation].) If at that hearing the sister state court 'determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify' ( . . . § 1334.2), that 'the laws of the state in which the prosecution is pending' will give the witness protection from arrest while the witness is present, and that the witness will be paid the fees mentioned in the previous paragraph, the court 'shall issue a subpoena . . . directing the witness to attend and testify in the court where the prosecution is pending' (*ibid.*; [citation])." (*People v. Cogswell* (2010) 48 Cal.4th 467, 475.)

10

The trial court tentatively agreed with the People that no showing of due diligence was required, but made a record of the People's efforts to procure Song's attendance at trial. Matthew Eleopoulos, a criminal investigator with the Solano County District Attorney's Office, testified that in early February 2013 he mailed a copy of a subpoena and his business card to Song's address in Connecticut. He received no response. Eleopoulos tried to contact Song through a phone number he had for Zhou, but the number was no longer in service. He conducted a search through a law enforcement search engine that produced two telephone numbers for Song—"[t]he one in Connecticut and the one in California which she no longer resided at with no additional phone numbers."

Eleopoulos also had an e-mail address for Song. Between February and May 2013, he sent Song three e-mails asking her to contact him. He also mentioned the subpoena and that his office would make arrangements for her travel to California. He received no response. On June 26, 2013—approximately one week in advance of trial— Eleopoulos contacted the leasing company associated with Song's address and asked if Song still lived there. About an hour and a half later, he received an e-mail and telephone call from Song. The e-mail was sent from the same e-mail address Eleopoulos had been using.

Eleopoulos informed Song that trial was scheduled to begin on July 2 and that he had been trying to subpoena her. Song said she had not received the subpoena or any of Eleopoulos's e-mails. She also stated she was currently working and going to school in Connecticut and would not be able to travel to California for the trial. Eleopoulos made it "very clear that we would be able to get her out here," and they could "work it out" if a date after July 2 would work for her. Song consistently stated that she was unable to attend trial because of work and school obligations. However, Eleopoulos inferred that she did not feel like coming to California to testify. Eleopoulos was familiar with the Uniform Act's subpoena process for out-of-state witnesses, but he did not attempt to use its procedures or contact any authorities in Connecticut.

11

The trial court overruled Foy's objection and admitted Song's conditional examination testimony. The court explained: "[I]t seems to me there is valid conflicting argument on both sides. On one hand you have *Thompson*, and [on] the other hand you have these other cases that talk about the need for due diligence. *Thompson* is the only due diligence requirement with the conditional exam statutes. . . . The [*People v. Roldan* (2012) 205 Cal.App.4th 969] case is not a conditional exam case, but what is important about *Roldan* is simply some of the factors that it mentions . . . in terms of what to look for in terms of whether . . . confrontational issues exist. . . . [¶] . . . [¶] . . . Applying the comments in *Roldan*, it was under oath. Counsel was noticed. It was a conditional exam. This was some time ago, the witness would be moving out of state. It was videotaped, which addresses some concerns . . . ." The videotaped testimony of Song's conditional examination was played for the jury.

B.     *Analysis*

Foy contends the trial court erred by admitting Song's conditional examination testimony absent a finding of Sixth Amendment unavailability. He asserts: "[T]he prosecution in this case was required to make a good faith, reasonable effort to secure Song's presence at trial even though she was not living in California. Although Song was examined conditionally and her testimony was videotaped, the videotaped testimony was still hearsay evidence. Accordingly, the prosecution was required to establish Sixth Amendment unavailability . . . ."

Sections 1335 through 1345 govern conditional examinations. "In all criminal cases, 'other than those for which the punishment may be death' (§ 1335, subd. (a)), the prosecution may apply for a court order compelling a material witness to submit to a conditional examination if the witness '*is about to leave the state*, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult' (§ 1336, subd. (a).) The prosecution may also apply for such an order in cases in which the 'defendant has been charged with a serious felony or in a case of domestic violence,' even where the punishment may be death, 'if there is evidence that the life of the witness is in jeopardy.'

12

(§ 1335, subd. (b); see § 1336, subd. (b); *People v. Jurado* (2006) 38 Cal.4th 72, 113 . . . .)" (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1519, italics added.)

The party requesting the conditional examination must submit an affidavit stating, among other things, that "the witness *is about to leave the state*, or is so sick or infirm . . . that he or she will not be able to attend the trial . . . ." (§ 1337, subd. (d)(1), italics added.) "If, at the designated time and place, it is shown to the satisfaction of the magistrate that the stated ground for conditional examination is not true or that the application was made to avoid the examination of the witness at the trial, the examination cannot take place." (§ 1341.) At the conditional examination, "[t]he testimony given by the witness shall be reduced to writing and authenticated in the same manner as the testimony of a witness taken in support of an information. Additionally, the testimony *may* be video-recorded." (§ 1343, italics added.) During the conditional examination the defendant has the right to be present with counsel. (§ 1340, subd. (a).) Section 1345 provides: "The deposition, or a certified copy of it, *may* be read in evidence, or if the examination was video-recorded, that video-recording *may* be shown by either party at the trial *if the court finds that the witness is unavailable as a witness within the meaning of Section 240 of the Evidence Code*. The same objections may be taken to a question or answer contained in the deposition or video-recording as if the witness had been examined orally in court." (Italics added.)

There is no dispute that Song's conditional examination was properly taken under California law. The question is whether Song's conditional examination testimony was admissible under Sixth Amendment standards. The trial court apparently believed that it need not address due diligence or good faith because Song was per se constitutionally unavailable by virtue of living out of state and having been examined and cross-examined at a videotaped conditional examination.[9] In reaching that conclusion, the trial court misplaced its reliance on *Thompson, supra,* 61 Cal.App.4th 1269.

---

[9] Although the People maintained this argument at trial, it appears to have been abandoned on appeal.

In *Thompson*, the defense objected to admission of conditional examination testimony of a witness who, after receiving a subpoena, notified the People she planned to be on an out-of-state vacation at the time of trial. The trial court found the out-of-state vacation sufficient to permit the conditional examination and its admission. The trial court also declined the defendant's request for findings on unavailability and the prosecution's due diligence. (*Thompson, supra,* 61 Cal.App.4th at p. 1277 & fn. 9.) The defendant challenged the trial court's ruling on appeal, arguing that the conditional examination testimony could not be admitted absent a finding of due diligence. (*Id.* at pp. 1271, 1278.)

The reviewing court found no statutory error, concluding that the witness's planned absence from the state was the equivalent of unavailability. (*Thompson, supra,* 61 Cal.App.4th at p. 1280.) The court noted an anomaly created by section 1345's requirement that, for admission of conditional examination testimony, a witness must be unavailable under Evidence Code section 240.[10] It observed: "[S]ections 1336, 1337 and 1341 provide for a conditional examination when a witness is about to leave the state. *None* of these sections mention an unavailability requirement under Evidence Code section 240. Therefore, . . . section 1336 allows a party to apply for a conditional examination when a witness is about to leave the state; section 1337 requires an affidavit showing such absence; and section 1341 provides the examination shall not take place if the magistrate is not satisfied the witness will be absent from the state. Yet the transcript of the conditional examination may be read into evidence if the court finds the witness unavailable under Evidence Code section 240, which does not list absence from the state as a form of 'unavailability.' " (*Thompson, supra,* 61 Cal.App.4th at p. 1279.)

---

[10] At the time, former section 1345 allowed " '[t]he deposition, or a certified copy thereof, may be read in evidence by either party on the trial *if the court finds that the witness is unavailable as a witness within the meaning of Section 240 of the Evidence Code.*' " (*Thompson, supra,* 61 Cal.App.4th at p. 1278, fn. 10, italics added.)

14

The *Thompson* court adopted a pragmatic approach to reconcile section 1345 with the remainder of the statutory scheme. It explained: "The statutes governing conditional examinations list absence from the state as a reason for a conditional examination. The court found [the prosecution's witness] would be absent from the state during trial and allowed her conditional examination. During trial, the court admitted the examination into evidence. The examination was conducted under oath and included a cross-examination by defense counsel. Even though Evidence Code section 240 does not define an out-of-state witness as unavailable, we believe a reading of . . . sections 1335–1345 mandates such a conclusion. Therefore, the court did not err in admitting [the witness's] conditional testimony." (*Thompson, supra,* 61 Cal.App.4th at p. 1280, fn. omitted.)

The court held that, as a matter of statutory law, conditional examination testimony is admissible simply on a showing the witness is outside the state. (*Thompson, supra,* 61 Cal.App.4th at pp. 1277–1280.) At least as applied here, *Thompson*'s expanded definition of unavailability is arguably in conflict with Evidence Code section 240's express definitions. *Thompson* therefore provides a less than secure foundation for admission of conditional examination testimony, even under state law. (See § 240, subd. (a)(4), (5) [" 'unavailable as a witness' means that the declarant is . . . [a]bsent from the hearing and the court is unable to compel his or her attendance *by its process*" or "the proponent of [the declarant's] statement has exercised *reasonable diligence* but has been unable to procure his or her attendance *by the court's process*" (italics added)]; *People v. Blackwood* (1983) 138 Cal.App.3d 939, 946 [" 'court's process' . . . includes interstate process under the Uniform Act"]; *People v. Masters* (1982) 134 Cal.App.3d 509, 523 ["[i]t is clear that in criminal cases a California court's 'process' includes the interstate processes made available by the [U]niform [A]ct to states which are parties to the compact"]; *People v. Joines* (1970) 11 Cal.App.3d 259, 266–267 [as used in Evid. Code, § 240, "process" includes process under Uniform Act]; *People v. Nieto* (1968) 268 Cal.App.2d 231, 239 ["it is now established that the provisions of [Evid. Code,

15

§ 240] make resort to the Uniform Act . . . necessary in efforts to compel a witness to attend a trial"].)

We need not decide the state law question because Foy in his opening brief does not press it. Nonetheless, *Thompson* does not resolve this appeal because the *Thompson* court concluded any confrontation clause issue had been forfeited by the defendant's failure to raise it before the trial court. (*Thompson, supra,* 61 Cal.App.4th at p. 1280, fn. 11.) In contrast, Foy's confrontation clause objection was expressly detailed to the trial court. We agree with Foy that the constitutional admissibility of Song's conditional examination testimony is governed by *Barber v. Page, supra,* 390 U.S. 719 (*Barber*), *People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*), and *Herrera, supra,* 49 Cal.4th 613, rather than *Thompson*.

In *Barber*, the witness whose testimony was sought in an Oklahoma trial was incarcerated in a federal prison in Texas. (*Barber*, *supra,* 390 U.S. at p. 720) To justify its introduction of the witness's preliminary hearing testimony, despite having made no effort to obtain his presence at trial, the prosecution claimed the witness was outside of Oklahoma and therefore per se "unavailable." (*Id.* at pp. 722–723.) The United States Supreme Court held the prosecution was required to make a good faith effort to obtain the witness's attendance. "Whatever may have been the accuracy of [the prosecution's] theory at one time, it is clear that at the present time increased cooperation between the States themselves and between the States and the Federal Government has largely deprived it of any continuing validity in the criminal law. For example, in the case of a prospective witness currently in federal custody . . . federal courts [have] the power to issue writs of habeas corpus *ad testificandum* at the request of state prosecutorial authorities." (*Id.* at pp. 723–724, fn. omitted.) The court also noted that "[f]or witnesses not in prison, the [Uniform Act] provides a means by which prosecuting authorities from one State can obtain an order from a court in the State where the witness is found directing the witness to appear in court in the first State to testify." (*Id.* at p. 723, fn 4.) The *Barber* court held the defendant was deprived of his Sixth Amendment confrontation rights by the introduction of the witness's former testimony. (*Id.* at pp. 724–725.)

16

In *Sandoval*, *supra*, 87 Cal.App.4th 1425, one of the prosecution's witnesses testified at the preliminary hearing and was thereafter deported to Mexico. In advance of trial, the witness indicated he was willing to return to testify if he could obtain a visa and passport and if the prosecution would pay his expenses. The prosecution declined to assist him. (*Id.* at p. 1432.) The witness was deemed unavailable and his preliminary hearing testimony was admitted at trial, under the former testimony exception to the hearsay rule (Evid. Code, § 1291). (*Sandoval*, at pp. 1428, 1433.)

The reviewing court agreed that the witness was unavailable under state law, pursuant to Evidence Code section 240, subdivision (a)(4), because he was " '[a]bsent from the hearing and the court [was] unable to compel his or her attendance by its process.' " (*Sandoval, supra,* 87 Cal.App.4th at p. 1433, & fn. 2.) But the constitutional question—whether the witness "was unavailable, applying the constitutional standard"— was a different matter. (*Id.* at pp. 1434–1435.) The court explained that " '[t]he basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." ' " (*Sandoval,* at p. 1438, italics omitted.)

The *Sandoval* court recognized that other California courts had previously held that " 'a [witness who is a] foreign citizen outside of the country can be considered per se unavailable without violating the Sixth Amendment.' " (*Sandoval, supra,* 87 Cal.App.4th at p. 1439, citing *People v. Denson* (1986) 178 Cal.App.3d 788, 792, and *People v. Ware* (1978) 78 Cal.App.3d 822, 833; *Sandoval*, at p. 1433, fn. 1.) Nonetheless, a different holding was necessitated by changed conditions. Specifically, the United States had entered into a treaty with Mexico, which allowed the prosecutor to request assistance from Mexican authorities in obtaining the attendance of the witness. (*Sandoval,* at pp. 1440–1441, citing *Barber, supra,* 390 U.S. at pp. 723–725.) The *Sandoval* court reasoned: "It is sufficient for our present purposes to point out . . . that the prosecution had several reasonable alternatives it could have pursued to obtain [the witness's] live testimony at trial. Instead of making a good faith effort to obtain any category of

17

contemporary, live testimony, the prosecution threw up its hands and asserted [the witness] was unavailable simply because he was a foreign citizen residing outside of the United States. The confrontation clause, which allows for some exceptions to the face-to-face confrontation requirement, calls for more. . . . [¶] . . . Consideration of the options available to the prosecution and the extent to which the prosecution attempted to use these alternatives to obtain [the witness's] presence establishes that the prosecution did not make a reasonable, good-faith effort. [Citation.] It did not exercise due diligence. [Citation.] Therefore, use of [the witness's] former testimony violated the defendants' right to confrontation." (*Sandoval,* at pp. 1443–1444.)

Likewise, in *Herrera,* our Supreme Court acknowledged that a witness in a foreign country might be unavailable under Evidence Code section 240, subdivision (a)(4), without a "reasonable diligence" showing, but made clear that "unavailability *in the constitutional sense* nonetheless requires a determination that the prosecution satisfied its obligation of good faith in attempting to obtain [the witness's] presence." (*Herrera, supra,* 49 Cal.4th at pp. 622–623.) The court also discussed *Sandoval, supra,* 87 Cal.App.4th 1425 and agreed that "when a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through *its own process*, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. [Citation.] Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met." (*Herrera,* at pp. 626–628, italics added & fn. omitted.)

*Barber, Sandoval,* and *Herrera* teach that admission of a witness's former testimony without a finding of constitutional unavailability violates the confrontation clause of the Sixth Amendment. This authority also makes plain that the prosecution's efforts to use the Uniform Act or other established procedures for obtaining the presence

18

of an out-of-state witness is relevant to that constitutional test.  The People make no attempt to distinguish this authority.  In fact, the People ignore it.

The trial court appears to have distinguished this line of authority because *Barber, Herrera,* and *Sandoval* involved the admission of preliminary hearing testimony. (*Barber*, *supra,* 390 U.S. at pp. 722–723; *Herrera, supra,* 49 Cal.4th at p. 629; *Sandoval*, *supra,* 87 Cal.App.4th at p. 1432.)  It is true that Song provided sworn testimony at a *videotaped* conditional examination, with Foy and his counsel present and participating. And language in some prior opinions suggest that videotaping a witness's preliminary hearing or conditional examination testimony ameliorates some confrontation clause concerns.  (See *People v. Roldan, supra,* 205 Cal.App.4th at p. 981 [videotaping a witness's preliminary hearing testimony "would have facilitated a chief objective of the confrontation clause, which is to allow the jury an opportunity to observe the witnesses' demeanor while testifying under oath"]; *People v. Ware, supra,* 78 Cal.App.3d at pp. 831–832 [videotaping witness's testimony at preliminary hearing satisfies purpose to compel witness to " 'stand face to face with the jury' "].)  However, Song's conditional examination remained, in essence, a deposition.  (§ 1345.)

" '[T]he primary object of the [confrontation clause of the Sixth Amendment] . . . was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " (*Barber, supra,* 390 U.S. at p. 721, italics omitted.)  " ' "The general principle upon which depositions and former testimony should be resorted to is the simple principle of *necessity*—i.e., the absence of any other means of utilizing the witness'[s] knowledge." ' " (*People v. Reed* (1996) 13 Cal.4th 217, 226.)  In order to admit such an out of court statement, the People were required under the Sixth Amendment to establish necessity—in the form of unavailability.  (*Brumley v. Wingard* (6th Cir. 2001) 269 F.3d 629, 641–644 [admission of videotaped deposition testimony

19

without showing witness's unavailability violates confrontation clause]; *Crawford v. Washington* (2004) 541 U.S. 36, 59 ["[t]estimonial statements of witnesses absent from trial have been admitted *only where the declarant is unavailable, and* only where the defendant has had a prior opportunity to cross-examine" (italics added)]; *Maryland v. Craig* (1990) 497 U.S. 836, 850 ["our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial *only where denial of such confrontation is necessary* to further an important public policy and only where the reliability of the testimony is otherwise assured"];[11] *Barber, supra,* 390 U.S. at p. 722; *Herrera, supra,* 49 Cal.4th at p. 623 ["unavailability in the constitutional sense . . . requires a determination that the prosecution satisfied its obligation of good faith in attempting to obtain [the witness's] presence"].)

We agree with Foy that Song's conditional examination testimony was admissible only if the People demonstrated a good faith, reasonable effort to secure her attendance at trial. Accordingly, we turn to an independent review of the People's efforts to satisfy that burden. (*Herrera, supra*, 49 Cal.4th at p. 623; *Sandoval, supra,* 87 Cal.App.4th at pp. 1428, 1432.) Foy's position is that, after locating Song on June 26, 2013, the People's failure to invoke the Uniform Act procedures demonstrates a lack of due diligence. The People, on the other hand, maintain the Sixth Amendment was not violated because the prosecutor engaged in reasonable efforts to procure Song's attendance at trial.

---

[11] *Maryland v. Craig, supra,* 497 U.S. 836 held that the confrontation clause does not prohibit a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television. The holding was justified by a case-specific finding of the necessity of protecting the child from suffering serious emotional distress in the presence of the defendant. (*Id.* at pp. 843, 849–850, 852, 857.) Because the child's testimony by closed-circuit television was necessary to further a compelling state interest and maintained the other elements of confrontation—oath, cross-examination, and observation of the witness's demeanor—it did not violate the confrontation clause. (*Id.* at pp. 851–852, 857.)

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. ([*Barber*], *supra*, 390 U.S. at pp. 724–725 . . . .) The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness's intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.' " (*Herrera, supra,* 49 Cal.4th at p. 622.)

"Our Evidence Code features a similar requirement for establishing a witness's unavailability. Under [Evidence Code] section 240, subdivision (a)(5) . . . , a witness is unavailable when he or she is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.' The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.] In this regard, 'California law and federal constitutional requirements are the same . . . .' " (*Herrera, supra,* 49 Cal.4th at p. 622, italics omitted.)

In *People v. Masters, supra,* 134 Cal.App.3d 509, the prosecution attempted to obtain the presence of a victim who was the sole witness to one count of robbery. The witness had moved to Arkansas before trial, and declined to return to California because she had started a new job. (*Id.* at pp. 520–522.) The prosecution served her with a subpoena in Arkansas and made numerous telephone calls attempting to persuade her to

21

attend trial. Because she had not been served in California the subpoena had no legal effect. The reviewing court found the prosecution's efforts insufficient to establish reasonable diligence when the prosecution failed to use the Uniform Act to compel her attendance. (*Id.* at pp. 526–528.)

Likewise, in *People v. Blackwood, supra*, 138 Cal.App.3d 939, Division Four of this court concluded the prosecution did not establish reasonable diligence when it made no effort to use the Uniform Act to compel the attendance of an out-of-state witness located eight days before trial. The prosecution could not reasonably justify its failure to act based on its belief that the states were unlikely to issue a timely subpoena or would deny the request outright because of undue hardship to the witness. (*Id.* at pp. 946–947.) The court concluded: "Although the prosecution tracked down its missing witness and offered to pay his expenses in returning to California to testify it failed to make any attempt to use the [Uniform Act] to obtain a subpoena for compelling his return. *Where the prosecution knows of the witness's location and procedures exist to bring the witness to court,* [*Evidence Code*] *section 240, subdivision* (*a*)(5) *requires those procedures be employed*. Since the prosecution did not do so it was error for the trial court to permit the reading of [the witness's] prior testimony at appellant's trial, and that error was of constitutional dimension." (*Id*. at p. 947, italics added.)

Here, the trial court did not reach the issue of good faith/due diligence. Nonetheless, we have reviewed the record and conclude the People did not carry their burden. The People argue their efforts to locate Song were reasonable in light of Foy's stipulation at the original trial. On the other hand, the People concede it was known, no later than March 2013, that Foy intended to challenge admission of Song's conditional examination testimony at his second trial. We will assume that the prosecution made reasonable efforts to locate Song. But once they located her, as in *People v. Masters* and *People v. Blackwood*, the People did not demonstrate good faith efforts to procure Song's attendance at trial.

Just as in *People v. Masters,* the subpoena Eleopoulos sent to Song in Connecticut had no legal effect. When Eleopoulos located Song, on June 26, 2013, and she expressed

her reluctance, he made no effort to use the Uniform Act, which had been adopted by both Connecticut and California, to compel her attendance. (§ 1334 et seq.; Conn. Gen. Stat. § 54-82i; *Hickey v. Commissioner of Correction* (2004) 82 Conn.App. 25, 38 [842 A.2d 606, 615].) By that time, Foy's objection to admission of Song's conditional examination testimony was apparently anticipated.

The People do not persuasively explain why it was reasonable to forego such measures after "Song refused to come voluntarily." The People argue: "[T]he result of the Uniform Act was neither certain nor automatic. There was no way of knowing just how long the procedure would take to run its course, nor whether it would be successful given Song's insistence that she was unable to come out because of school and work." We cannot accept the People's assumption there was insufficient opportunity to make use of the Uniform Act when it located Song a week before trial.[12] (See *People v. Blackwood, supra,* 138 Cal.App.3d at p. 947 ["[o]nly if it in fact becomes impossible to secure the process, has the prosecution sustained its burden" (italics omitted)].) Nor could the prosecutor simply assume that Song's vague work and school obligations would demonstrate undue hardship. (See *Barber, supra*, 390 U.S. at p. 724 [" 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff' "]; *Blackwood,* at p. 947 ["[t]he prosecution's duty was to invoke the [Uniform Act], not to decide whether such action would be fruitful"].) The People did not meet their burden of showing due diligence. The trial court's admission of Song's conditional examination testimony in these circumstances violated Foy's Sixth Amendment confrontation rights.[13]

---

[12] The People do not suggest Foy waived his confrontation clause argument by declining an offer to continue trial to secure Song's attendance. (See *People v. Masters, supra,* 134 Cal.App.3d at p. 526, fn. 11 [a witness's sudden departure on eve of trial can give rise to good cause to continue trial to initiate or complete Uniform Act procedures; a defendant who declines an offer to continue waives right to insist on use of Uniform Act]; *People v. Cox* (1969) 269 Cal.App.2d 579, 584–585 [same].)

[13] We do not hold that the confrontation clause always requires an effort to use the Uniform Act. We hold only that the People were required to attempt to compel Song's attendance in the circumstances present here.

Reversal is required unless the record shows beyond a reasonable doubt that Foy was not prejudiced. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661; *People v. Mendieta* (1986) 185 Cal.App.3d 1032, 1039.) *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman,* at p. 24.) " ' "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

To determine whether a confrontation clause violation is harmless beyond a reasonable doubt, courts consider "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.) The People have not shown that the erroneous admission of Song's conditional examination testimony was harmless beyond a reasonable doubt.

Song was the victim of the robbery alleged in count one, but her testimony on the circumstances of the robbery was cumulative of the live witness testimony. However, identity was the key disputed issue at trial. No witness identification testimony linked Foy to the Jack in the Box robbery. Song's conditional examination testimony was critical to the prosecution's identity case because Song's identification of the content of the flash drive served as the strongest link between Foy and the Jack in the Box robbery. Greenberg testified on cross-examination that the flash drive belonged to Xu, but Xu herself did not testify.

24

Without Song's testimony, the other evidence against Foy may have been sufficient to support the verdict. But contrary to the People's argument, the additional incriminating evidence—Greenberg's testimony regarding the flash drive, Foy's proximity to Rackley and the Mirage at 603 Grant Street, the presence of Foy's dismantled phone in Rackley's car, Foy's flight, Foy's height, the cash found in Foy's pockets, and the phone records—was not overwhelming. Although Foy's credibility was legitimately subject to challenge, he presented an uncorroborated alibi and some explanation for the incriminating evidence against him.

Nor can we agree with the People that there was no harm in admitting Song's conditional examination testimony because "[t]he examination was videotaped, which allowed the jury to view Song and judge [her credibility] by her demeanor upon the stand and the manner in which she testified." Taken to its logical conclusion, the People's argument suggests admission of videotaped deposition testimony from a witness who is not unavailable could never constitute prejudicial error. (See *Brumley v. Wingard, supra,* 269 F.3d at p. 645.) We reject the People's argument because it turns our prejudice analysis—and the confrontation clause—on its head.

We agree with Foy that the jury deadlock in the first trial impacts our prejudice analysis. The strength of Foy's argument is lessened by the fact Song's conditional examination testimony was also admitted at the first trial. (See *People v. Avila* (2005) 131 Cal.App.4th 163, 171.) It is not our role to speculate on the reason for the deadlock, but the divergent verdicts suggest a close case. On this record, we cannot conclude that the trial court's error was harmless beyond a reasonable doubt.

### III.    DISPOSITION

The judgment is reversed.

25

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
SIMONS, J.

A141073

Superior Court of Solano County, No. VCR213746, Tim P. Kam, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Laurence K. Sullivan, Moona Nandi and Michael Rhoads, Deputy Attorneys General, for Plaintiff and Respondent.