Filed 4/23/25  P. v. Sanchez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082265 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1202886) |
| RAUL ALCANTAR SANCHEZ, JR., | ORDER MODIFYING OPINION NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on April 4, 2025, be modified as follows:

On page 42, line 7, the following sentence should be deleted in its entirety:  "We conclude Sanchez received a fair guilt phase trial that comported with due process and the two errors do not rise to the level of prejudice necessary to reverse Sanchez's guilt phase convictions."  The deleted sentence should be replaced with the following:

> We conclude Sanchez received a fair guilt phase trial that comported with due process and the three errors do not rise

to the level of prejudice necessary to reverse Sanchez's guilt phase convictions.

BUCHANAN, Acting P. J.

Copies to:  All parties

Filed 4/4/25  P. v. Sanchez CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAUL ALCANTAR SANCHEZ, JR.,<br><br>    Defendant and Appellant. | D082265<br><br><br><br>(Super. Ct. No. INF1202886) |

APPEAL from a judgment of the Superior Court of Riverside County, Anthony R. Villalobos, Judge.  Affirmed in part, reversed in part and remanded.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

Raul Alcantar Sanchez, Jr. (Sanchez) appeals the judgment after a jury rejected his mental-state defense, convicted him of the first degree murder of Carolina V. (Pen. Code,[1] § 187, subd. (a)), and found true the allegations that he personally used two dangerous and deadly weapons (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)).[2] The jury later determined he was sane at the time of the murder. The court sentenced Sanchez to prison for a one-year determinate sentence, plus an indeterminate sentence of 25 years to life.

Sanchez contends the prosecutor committed error during voir dire and the guilt-phase closing argument by referencing the presumption of sanity. He contends the trial court committed four instances of reversible error when instructing the jury, and claims ineffective assistance of counsel for any arguments forfeited due to his counsel's failure to object. He also asserts the court erred (1) in admitting a video-recorded conditional examination of the prosecution's sanity-phase rebuttal witness because the prosecution failed to exercise diligence in attempting to secure the witness's live testimony; and (2) by failing to investigate an allegation of juror misconduct. He argues the cumulative impact of these errors requires reversal of his convictions.

As we will explain, we find no prejudicial error in the guilt phase of trial. As to the sanity phase, we conclude the trial court erred in admitting the video-recorded conditional examination of the prosecution's rebuttal witness because the prosecution failed to exercise reasonable diligence in attempting to secure the witness's live testimony and the error was not

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    This is the result of Sanchez's second jury trial. His first trial resulted in a mistrial after the jury deadlocked. All factual references are to the second jury trial which resulted in Sanchez's conviction.

harmless beyond a reasonable doubt.[3]  We therefore affirm the guilt phase verdict but reverse the sanity phase verdict and remand the matter for a new trial on the sanity phase.

FACTUAL AND PROCEDURAL BACKGROUND

Sanchez has a history of bizarre behavior.  His younger brother, Efren, first observed abnormal behavior when Sanchez was in his mid-20's.  Sanchez yelled and screamed, had conversations with himself while gesturing with his hands, and displayed different personalities.  On multiple occasions between 2010 and 2012, Efren took Sanchez to mental health clinics where Sanchez obtained medication.

In November 2012, Sanchez was 30 years old and lived with his father Raul Sanchez, Sr. (Senior) and Senior's girlfriend, Carolina (Carol), in a trailer.  The trailer had three bedrooms; Senior and Carol shared a bedroom and Sanchez's bedroom was a side wing of the trailer.  Sanchez cussed, occasionally made threats, and called Carol names.  Carol told Senior she feared Sanchez.

Senior frequently saw Sanchez talking to himself and gesturing. Sanchez would stand for hours under a tree or facing the wall on the porch while talking to himself and gesturing.  Senior believed Sanchez heard voices in his head.  Efren observed episodes where Sanchez talked to himself while gesturing, stating these episodes occurred almost daily.  Sanchez also exhibited different personalities, with some more aggressive than others. David G., a family friend, once saw Sanchez outside the trailer, talking to

---

[3]     Sanchez also asserts, and the People agree, the abstract of judgment requires correction to accurately state the amount of presentence credits to which he is entitled.  We decline to address this issue because it will be moot if the sanity phase is retried and Sanchez is found insane.  If the insanity claim is again rejected, the parties can raise this issue in the trial court.

himself and gesturing as if someone else was there. A neighbor also saw Sanchez talking to himself while gesturing. Sanchez sometimes yelled or spoke loudly and removed his clothing.

By mid-November, Sanchez's episodes had become more intense and frequent, prompting family conversations about taking him to a mental health clinic. On November 17, 2012, Efren decided to take Sanchez to a mental health clinic, stopping first at a store to get Sanchez some warm clothing. Sanchez was unable to pick out clothing, instead he gestured and pointed at things as if in a conversation with someone. They were turned away at the clinic because no doctors were available, and Sanchez was never seen.

Sanchez told Alicia S.P., Carol's best friend, he did not like Carol and did not want her living in the trailer.[4] Alicia heard Sanchez threaten Carol, including repeatedly stating he would kill Carol. Sanchez once told Carol "he wanted to cut her head off and hang it outside for the neighbors to see." He also told Carol he would "cut her open and eat her insides." Alicia saw Carol with red marks and bruises on her neck after Sanchez choked her and pinned her against a wall. Another time, Carol had a gash on her forehead from being struck by a candlestick Sanchez threw at her. Alicia observed that Sanchez's threats became more frequent in the time leading up to Carol's death.

On November 20, 2012, the evening before the stabbing, Carol called her friend Susan U. crying and upset because Sanchez was threatening her

---

[4]     From 2006 to 2012, Alicia also saw Sanchez walk aggressively around the neighborhood while muttering or talking to himself. She noted these episodes became more frequent in 2012.

4

and Senior was about to leave the trailer.  Sanchez threatened to "get" Carol while showing her a butter knife.  At that time, Senior was still at the trailer.

The next morning, Sanchez's neighbor saw him outside, gesturing and seemingly talking to himself.  David also saw Sanchez that morning sitting on a curb.  Although it was cold Sanchez wore shorts, a tank top, a flannel shirt, socks and flip-flops.  As David drove Sanchez home, Sanchez began talking to himself as if conversing with someone else.

That afternoon, Carol called Susan a second time after Senior had left the trailer.  Susan could hear banging and Carol yelling " 'stop it.  Go away.' " Carol was crying and sounded scared.  Carol told Susan she was going to leave the house, go to the market down the street and have someone pick her up.  Carol called Susan a third time.  The banging and yelling had stopped but Carol was still in her room with the door locked.

That same day, Roberto M. went to Carol's home looking for Senior. Sanchez came out when Roberto whistled.  Sanchez said his father was not home and asked Roberto if he wanted to see something.  When Roberto asked what it was, Sanchez replied that he had killed Carol.  When asked why he killed Carol, Sanchez said he disliked her and obeyed the voices when they told him to do it.  Roberto noticed that Sanchez's hair and shorts were wet, he saw blood on Sanchez's shorts, and blood dripping from Sanchez's wet hair. Speaking clearly, Sanchez claimed he killed Carol with a knife and a screwdriver and stated Carol's "skin was tough to pierce."

At Sanchez's grandmother's home nearby, Roberto found Senior and informed him of Sanchez's claim that he had killed Carol.  When the two returned to the trailer, Sanchez fled.  Senior saw Carol on the bedroom floor

with blood on her face and called 911.  Paramedics arrived and pronounced Carol dead.  Sheriff's deputies later spotted Sanchez and arrested him.

Carol died from multiple sharp and blunt-impact injuries.  She had about 122 sharp injuries and over a dozen "probable impacts to produce the blunt injuries."  During a recorded jail phone call, Sanchez told Senior he had been taking his pills and was going to ask his attorney to "explain to them . . . that I'm not well in the head."  Senior stated, "I know that it was the madness that made you do that."  Sanchez agreed it was the "madness."

Four medical experts evaluated Sanchez.  The court appointed Dr. Patricia Kirkish, a forensic psychologist, to evaluate Sanchez.  She first evaluated him in October 2015, when she did not have his records, and opined he had ongoing psychosis which impaired his rationality in some areas.  Dr. Kirkish later received Sanchez's records and conducted a second evaluation in October 2018.  His records from 2012 described internal stimuli and "gross psychotic-appearing behavior" which required placing him in a safety cell at one point.  After talking to Sanchez, Dr. Kirkish noted he suffered hallucinations, including command hallucinations that sometimes involved Carol.  After reviewing hypotheticals based on case evidence, Dr. Kirkish found the facts consistent with psychosis and responding to internal stimuli, suggesting ongoing psychosis.

Dr. Joy Smith Clark, a clinical and forensic psychologist, conducted a court-ordered evaluation of Sanchez in March 2016; she was aware of the charges and had reviewed Sanchez's prior medical records and jail records.  She believed Sanchez has schizophrenia with paranoid features, although she did not state a diagnosis of schizophrenia in her reports.  She opined Sanchez was psychotic at the time of the crime.  She stated that command hallucinations create intense stress and anxiety, compelling individuals to

6

obey to relieve the stress. She believed Sanchez was acting on his hallucinations and was possibly influenced by substance abuse.

In early 2019, the court appointed Dr. Maurizio Assandri, a forensic psychologist, to evaluate Sanchez. Dr. Assandri reviewed over a thousand pages of discovery and numerous doctors' reports, including Sanchez's records from jail and Patton State Hospital. Sanchez told Dr. Assandri he was not experiencing command hallucinations when he stabbed Carol. Nonetheless, based on his interview with Sanchez, Dr. Assandri opined Sanchez did not have control over his behavior. When given case-based hypotheticals, he found them consistent with psychotic symptoms or ongoing psychosis.

In February 2018, forensic psychologist Dr. Jennifer Bosch evaluated Sanchez for the prosecution. On the day of the crime, Sanchez claimed he experienced command hallucinations, described an urge to kill Carol but denied a command hallucination when he decided to kill Carol. During her evaluation Sanchez showed no indication of depression, anxiety or distraction, hallucinations or delusions—he appeared to be "symptom-free." In discussing his mental health, Sanchez said he had been medicated. She noted three hospitalizations, including two Welfare and Institutions Code section 5150 involuntary holds in September and November 2011.

## DISCUSSION
### I. *ALLEGED PROSECUTORIAL ERROR*
A. *Factual Background*

During voir dire, the prosecutor explained to the venire there would be two phases of trial—the guilt phase and the sanity phase—and during the guilt phase it was her burden to prove each element of the charges. She added, "[i]n the guilt phase, there is a conclusive presumption that a defendant was sane at the time of the crime. That's not something for you to consider." After a prospective juror asked the prosecutor to repeat what she

7

said, the prosecutor again explained the two phases of trial and told the jury that during the guilt phase, "[t]he presumption is innocence and there is a conclusive presumption of—that the defendant was sane at the time. What that means in the deliberation process is sanity does not—does not play a part." The prosecutor then asked:

> "Is everybody okay with that? Can I get a show of hands, because it's important. I want you to feel very comfortable. And if there's questions, please let me know, because this is not the everyday experience of two phases."

Returning from a break, the prosecutor stated that during the guilt phase there was a presumption of sanity and a presumption of innocence, asking whether anyone was confused or had any issues with these presumptions. She then repeated that the defense must prove insanity at the sanity phase by a preponderance of evidence and asked if any prospective juror had a problem with that.

The following day, defense counsel objected to the prosecutor's statements, "there's case law discussing that the jury should not be instructed on the presumption of sanity at the guilt phase. And one of the things that [the prosecutor] said to the jury yesterday is that there is a presumption of sanity related to both phases. [¶] Since they should not be instructed as to the presumption of sanity in the guilt phase, I don't think that it's appropriate to voir dire that there's a presumption of sanity related to the guilt phase, because that's not part of the instruction." The prosecutor replied that under *People v. Panah* (2005) 35 Cal.4th 395 (*Panah*) and *People v. Guillebeau* (1980) 107 Cal.App.3d 531 (*Guillebeau*), "it's completely

8

appropriate to talk about the two phases in voir dire, to notify them and get their feelings, because there are different standards."

Later, the prosecution again addressed the two phases of trial, explaining that during the guilt phase there is "a conclusive presumption that a person was sane at the time of the act." Defense counsel again objected, with the court overruling the objection and deeming it ongoing. The prosecutor then explained, "you can't consider anything about sanity at all during [the guilt phase]." If, however, the jury finds the defendant guilty of the offense beyond a reasonable doubt, "then there's a second phase." At the sanity phase, the prosecutor explained the defendant must establish by a preponderance of evidence that he was legally insane at the time of the offense.

After a prospective juror expressed confusion regarding sanity and the ability to form intent, the court addressed the panel by quoting from section 28, subdivision (a), and adding the last sentence on the introduction of evidence of a mental disorder in the sanity phase.[5] Both counsel agreed with what the court told the jury panel. The following day, defense counsel requested that the two prior panels of prospective jurors receive the same instruction. After hearing from the prosecutor, the court indicated it would give the matter some thought.

After the jury was sworn and given the preliminary instructions, defense counsel again asked the court to provide the requested admonishment. The court denied the request due to its concern the

---

[5]     The court informed this jury panel "evidence of mental disorder to show that the defendant did not actually form a mental state required for guilt of a charged crime may be introduced" and "evidence of a mental disorder can then be introduced in the sanity phase, but that's to prove or disprove the theory that the defendant was sane or insane at the time of the crime."

9

information would confuse the jury. It believed the issue "would be remedied with the instructions I give them at the end of the guilt phase."

During guilt-phase closing argument, the prosecutor told the jury, "Sanity is not an issue. At this point in the trial, under the law, the defendant is 100 percent sane." Defense counsel objected on the ground this instruction should not be given during the guilt phase. The court discussed the matter in chambers and overruled the objection. The prosecutor resumed: "At this point in the trial, sanity is not an issue. He at this point is presumed to be 100 percent sane. [¶] What you need to consider in this case is the totality of the evidence. Let reasonableness be your guide, and common sense is key."

Defense counsel began her argument by emphasizing the instructions said nothing about a presumption of sanity and that the jury could consider mental health evidence in determining intent. She argued Sanchez was guilty of involuntary manslaughter because he acted without the specific intent to kill.

B. *Analysis*

Citing *People v. Well*s (1949) 33 Cal.2d 330, 355 (*Wells*) and *People v. Mills* (2012) 55 Cal.4th 663, 681 (*Mills*), Sanchez argues it is well-established that a trial court is prohibited from instructing the jury on the presumption of sanity during the guilt phase of trial. He contends the prosecutor's statements informing the jury about the presumption of sanity during voir dire and closing argument, along with the court overruling his objections to these comments, were the equivalent of the jury erroneously being instructed on the presumption of sanity. While we agree the presumption of sanity was irrelevant during the guilt phase of trial, we conclude the error was harmless based on the instructions given and the parties' arguments to the jury

10

regarding Sanchez's mental state and its relevance to the intent element of the charges.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial [error] under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)  To establish prosecutorial error during comments made to the jury, appellant must show that " '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)  The defendant has the burden of showing the jury construed the prosecutor's remarks in an objectionable fashion.  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129.)

Legal insanity "is established if the defendant was incapable of knowing or understanding the nature and quality of the criminal act, or of distinguishing right from wrong." (*Mills*, *supra*, 55 Cal.4th at p. 671; § 25, subd. (b).)  "[A] defendant may suffer from a diagnosable mental illness without being legally insane." (*Mills, supra*, at p. 672.)  When a defendant pleads not guilty and not guilty by reason of insanity, he or she is entitled to separate determinations of guilt and sanity before the same or different

11

juries. (§ 1026, subd. (a).)[6] Where the court elects to proceed with a single jury, there is no inherent harm in informing prospective jurors about the not guilty by reason of insanity plea and conducting voir dire on both the guilt and sanity issues at the same time. (See *Panah*, *supra*, 35 Cal.4th at pp. 434–435; *Guillebeau*, *supra*, 107 Cal.App.3d at pp. 542-544; *People v. Phillips* (1979) 90 Cal.App.3d 356, 362–364.)

"At the guilt phase, the People must prove all elements of the charged offense, including mens rea. The defense may not claim insanity. It may, however, produce lay or expert testimony to rebut the prosecution's showing of the required mental state. If found guilty, at the next phase of trial the defendant bears the burden of proving, by a preponderance of the evidence, that he was legally insane when he committed the crime." (*Mills*, *supra*, 55 Cal.4th at p. 672, fn. omitted.) "The presumption of sanity is not pertinent to any issue at a trial on the question of guilt. The matter of the defendant's sanity is not before the jury, and evidence of insanity is inadmissible." (*Id.* at p. 681; *Wells*, *supra*, 33 Cal.2d at pp. 350–351 ["As a general rule, on the not guilty plea, evidence, otherwise competent, tending to show that the defendant, who at this stage is conclusively presumed sane, either *did* or *did not*, in committing the overt act, possess the specific essential mental state, is admissible, but evidence tending to show legal sanity or legal insanity is not admissible."].) Accordingly, "[i]n a bifurcated trial under section 1026, it is proper to inform the jury of the procedure specified by statute, but there is no

---

6       Subdivision (a) of section 1026 provides, in relevant part: "If a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only the other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed."

12

reason to tell it, before or during the guilt phase, that the defendant is conclusively presumed sane for purposes of trial." (*Mills, supra*, at p. 681.)

Here, the prosecutor improperly referenced the presumption of sanity at voir dire and closing argument during the guilt phase because this presumption, while a correct statement of law, was irrelevant at this phase. (*Mills*, *supra*, 55 Cal.4th at p. 681.) The prosecutor could have easily informed the venire and seated jurors of Sanchez's not guilty by reason of insanity plea, the possibility of two phases of trial, and the shifting burdens of proof at each phase without also informing them Sanchez is presumed to be sane during the guilt phase of trial. The question before us is whether this error, given counsel's argument and the court's instructions, created " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

Sanchez contends the prosecutor's act of informing the seated jurors about the presumption of sanity directed them to disregard evidence of his mental disorder in determining whether he acted with the mental state required for murder. He argues because the jury learned of the presumption of sanity but was not provided with a definition of sanity, it may have improperly used the presumption to conclude he was not suffering from a mental disorder at the time of the crime. We are not persuaded.

In *Mills*, our Supreme Court found a similar error to be harmless. There, the trial court itself instructed the jury: " '*For the purpose of reaching a verdict in the guilt phase of this trial*, you are to conclusively presume that the defendant was legally sane.' " (*Mills, supra*, 55 Cal.4th at pp. 676–677.) The Supreme Court found that even though this instruction was error under state law (*id*. at p. 681), it did not violate due process when considering the

13

instructions as a whole and in the context of the entire trial. (*Id.* at pp. 678–680.) The court noted that the jury had also been instructed on the relationship between the evidence of the defendant's mental illness and the intent elements of murder, and on hallucination as a contributing cause of the homicide. (*Id.* at p. 678.) The court observed: "None of these instructions would have made sense if the jury understood that defendant was conclusively presumed to be free of mental disease or disorder." (*Id.* at pp. 678–679.) The court also noted that defense counsel had vigorously argued the mental health evidence to the jury, and even though the prosecutor had mentioned the presumption of sanity in closing argument, she had done so only in relating it to the bifurcated stages of trial, and she argued the merits of the defendant's mental health defense by challenging the reliability of the defense psychologist's testimony and asserting that defendant had fabricated his claim of unreasonable self-defense based on mental impairment. (*Id.* at p. 679.)

The Supreme Court summarized its due process holding as follows: "[G]iven the other accurate jury instructions regarding mental illness and unreasonable self-defense, and both counsel's arguments on the merits of those issues, there is no reasonable likelihood that the jury would have applied the presumption of sanity to reduce the prosecution's burden of proof . . . . [W]e do not presume the jury blindly followed an instruction that was inconsistent with other correct instructions and arguments of counsel. Rather, we view the record as a whole, and consider the instructions in context. This jury, which had been informed that a sanity phase would follow if defendant were found guilty, was likely to conclude that the presumption operated to preserve the issue of sanity for the appropriate phase." (*Mills, supra*, 55 Cal.4th at p. 680.) And for the same reasons the Supreme Court

14

rejected the due process claim, it also found the state law error to be harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Mills*, at p. 681.)

Although *Mills* involved a claim of unreasonable self-defense based on mental disease, we find its reasoning applicable here as well. The trial court correctly instructed the jury it could consider evidence of "mental disease, defect, or disorder" when determining whether the People proved Sanchez acted with the required intent or mental state (CALCRIM No. 3428). The court also instructed the jury it could consider evidence of hallucinations when determining whether the People met their burden of proving beyond a reasonable doubt that Sanchez acted with premeditation and deliberation (CALCRIM No. 627). Had the jury improperly used the presumption of sanity to conclude Sanchez was not suffering from a mental disease, defect, or disorder at the time of the crime, as Sanchez suggests, these instructions would have made no sense. (*Mills*, *supra*, 55 Cal.4th at pp. 678–679.) And here the court itself gave no instruction on the presumption of sanity; only the prosecutor mentioned the presumption and the jurors were instructed to disregard any of the attorney's comments that conflicted with the court's

instructions.[7]  In the absence of evidence to the contrary, the jury is presumed to have followed the court's instructions.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

The prosecutor's remarks about the presumption of sanity were also made in the context of explaining to the jury that sanity was not an issue in the guilt phase.  In voir dire, the prosecutor referred to the presumption in explaining that there would be a guilt phase and a separate sanity phase with different burdens of proof.  In closing argument, the prosecutor referred to the presumption in emphasizing that sanity was "not an issue" "[a]t this point in the trial."  While there was no need for the prosecutor to refer to the presumption of sanity at all to make this point, viewing her comments in context and in light of the correct jury instructions given on mental disease, here as in *Mills*, the jury "was likely to conclude that the presumption operated to preserve the issue of sanity for the appropriate phase."  (*Mills*, *supra*, 55 Cal.4th at p. 680.)

Additionally, during closing argument, the prosecution mentioned the presumption of sanity but then properly focused on the evidence showing Sanchez's intent to kill.  And defense counsel pointed out to the jurors that

---

7      Sanchez's reliance on *Stark v. Hickman* (9th Cir. 2006) 455 F.3d 1070 (*Stark*) is misplaced.  In *Stark*, the trial court instructed the jury "[i]n the guilt phase of a criminal action the defendant is conclusively presumed to be sane" but did not provide a definition of sanity or insanity.  (*Id.* at p. 1075.)  The *Stark* court stated:  "[T]he instruction read as a whole did not explain or cure the error because the jury was not told how to reconcile the presumption of sanity with [the] petitioner's attempts to prove he lacked the requisite intent to commit murder because of his mental condition.  Thus, the potential for confusion was rife, and a reasonable juror could have concluded that he or she must presume that [the] petitioner had no mental disease, defect, or disorder."  (*Id.* at p. 1080.)  In contrast, the trial court here instructed the jury on mental impairment pursuant to a standard pattern instruction and never mentioned the presumption of sanity.

the court's instructions were silent on the presumption of sanity—focusing the jury's attention instead on the instructions actually given regarding evidence of mental impairment. Specifically, she displayed CALCRIM No. 3428 on the Elmo projector and correctly told the jury, "this instruction says that you can take into account mental disease, defect, or disorder for the purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime." Defense counsel emphasized:

> "And so if anyone was thinking that because there is a presumption of sanity—sanity is not this phase; sanity may come later—but if anybody was thinking that meant that intent doesn't matter, that would be wrong. Intent absolutely matters. And mental condition impacting that intent and impairment is specifically what you're asked to consider in relation to both second degree murder and first degree murder."

During rebuttal argument, the prosecutor did not dispute defense counsel's point or mention the presumption of sanity. As in *Mills*, she also argued the merits of Sanchez's mental health defense, specifically relying on a statement he had made to Dr. Assandri that he did not hear any voices or experience any command hallucinations before and during the killing. Considering these arguments in their totality, we conclude Sanchez cannot overcome the usual presumption that the jurors followed the instructions they were given by the court, including CALCRIM No. 3428.

We recognize that the first jury apparently hung 11-1 based on one juror's agreement with Sanchez's mental health defense and the second jury appears to have been similarly deadlocked 11-1 over the mental health defense until the holdout juror was excused for misconduct. Based on the totality of the record and the reasoning of *Mills*, however, we conclude there

17

is no reasonable likelihood the jury would have applied the presumption of sanity to reduce the prosecution's burden of proof or based its verdict on anything other than the evidence and the court's correct instructions on mental disease as it relates to intent or state of mind.  (CALCRIM No. 3428.)  Accordingly, we find no due process violation and conclude the state law error is harmless under *Watson*.

## II. *ALLEGED INSTRUCTIONAL ERROR*

We now turn to Sanchez's arguments regarding the jury instructions.  He contends the court committed instructional error when it:  (1) gave an erroneous involuntary manslaughter instruction; (2) failed to instruct on nonstatutory involuntary manslaughter; and (3) failed to instruct on voluntary intoxication and voluntary intoxication causing unconsciousness.  We separately address each contention.

### A.  *General Legal Principles*

We review a claim of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  In a criminal case, the trial court has a sua sponte duty to instruct on general principles of law applicable to the case.  (*People v. Anderson* (2011) 51 Cal.4th 989, 996.)  That duty extends to instructions on defenses, but only if the defendant is relying on such a defense, or if the defense is supported by substantial evidence and is not inconsistent with the defendant's theory of the case.  (*Ibid.*)  This duty also includes instructing on lesser included offenses if the evidence suggests uncertainty about the presence of all elements of the charged offense.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

In determining whether substantial evidence warrants a jury instruction, the trial court does not determine the credibility of the defendant's evidence, but only whether sufficient evidence exists, which if

18

accepted by the jury, raises a reasonable doubt regarding defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) On review, we independently evaluate whether sufficient evidence existed to substantiate a defense. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.) " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] . . . assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

Error in giving a jury instruction is reviewed for prejudice under the *Watson* standard. (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.) Under the *Watson* standard, error is deemed to be harmless unless, upon examination of the entire record, it is reasonably probable the outcome at trial would have been different in the absence of the error. (*Watson, supra,* 46 Cal.2d at p. 836.) Generally, this test applies to wrongly omitted instructions that do not amount to federal constitutional error. (*Ibid.*)

B. *Alleged Erroneous Involuntary Manslaughter Instruction*

1. Factual Background

Sanchez requested the court instruct with CALCRIM No. 580 which defined involuntary manslaughter as an unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life. After off-the-record jury instruction conferences, the court reviewed the instructions on the record. The court stated

CALCRIM No. 580 had been requested by the defense and "will be given as modified," with neither party objecting. As given, CALCRIM No. 580 stated:

> "Involuntary Manslaughter is a lesser offense of Murder as charged in Count 1.
>
> "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.
>
> "The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.
>
> "The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed a crime; [¶] 2. The defendant committed the crime with criminal negligence; [¶] AND [¶] 3. The defendant's acts caused the death of another person.
>
> "*The People allege that the defendant committed the following crime: Murder. Instructions 500, 520 and 521 tells [sic] you what the People must prove in order to prove the defendant committed Murder.*
>
> "Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk.
>
> "In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same

20

situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter." (Italics added.)

2. Analysis

Sanchez notes the italicized language in CALCRIM No. 580 on involuntary manslaughter instructed the jury that the prosecution alleged he committed the crime of murder and referred the jury to instructions that murder requires either express or implied malice. He claims the italicized language rendered the instruction legally erroneous because murder, which requires malice aforethought, cannot be committed with criminal negligence. The People do not challenge Sanchez's argument because they cannot.[8]

Involuntary manslaughter is "criminally negligent unlawful homicide." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423; see *People v. Skiff* (2021)

_____

[8]     The People assert Sanchez forfeited this issue by failing to object to the instruction. Sanchez contends the error is not forfeited by defense counsel's failure to raise it in the trial court, claiming that the court had a sua sponte duty to orally instruct the jury and that the error violated his substantial rights. We consider Sanchez's argument on its merits because "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Additionally, to resolve Sanchez's alternative claim that his trial counsel rendered ineffective assistance by failing to object, we must address the merits of the issue.

59 Cal.App.5th 571, 579 ["The mental state required . . . is criminal negligence"].) "A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 580.) The italicized language erroneously referred the jury to the crime of murder when it should have referred it to some lesser included misdemeanor, infraction, noninherently dangerous felony, or inherently dangerous assaultive felony, and then directed the jury to the specific jury instructions on what elements the People were required to prove for the specified crime. (See Judicial Council of Cal., Crim. Jury Instns. (Oct. 2024) CALCRIM No. 580, p. 331.)

The Bench Notes to CALCRIM No. 580 provide that the court has a "sua sponte duty to specify the predicate misdemeanor, infraction or noninherently dangerous felony alleged and to instruct on the elements of the predicate offense(s)," citing authorities including *People v. Burroughs* (1984) 35 Cal.3d 824, 835. (Judicial Council of Cal., Crim. Jury Instns. (Oct. 2024) CALCRIM No. 580, p. 331; see *People v. McManis* (1972) 26 Cal.App.3d 608, 614 ["instruction defining misdemeanor within the context of a misdemeanor-manslaughter instruction must be given sua sponte"].) Here, instead of directing the jury to an underlying predicate offense committed with criminal negligence, the version of CALCRIM No. 580 given by the court incorrectly directed the jury to murder which requires either express or implied malice.

Sanchez argues the error constituted federal constitutional error because it deprived him the opportunity of a jury finding that his crime constituted a lesser included offense done without the intent to kill and or conscious disregard for human life. He asserts the error requires reversal under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). The People

22

claim the error was not prejudicial even under *Chapman* because the jury affirmatively determined Sanchez acted with a specific intent to kill. We agree with the People.

"Involuntary manslaughter is 'the unlawful killing of a human being without malice aforethought and without an intent to kill.' [Citation.] A verdict of involuntary manslaughter is warranted where the defendant demonstrates 'that because of his [or her] mental illness . . . he [or she] did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought).' " (*People v. Rogers* (2006) 39 Cal.4th 826, 884.) By convicting Sanchez of premeditated murder, the jury necessarily rejected the notion the killing was unintentional. His conviction of first degree murder shows beyond a reasonable doubt the erroneous involuntary manslaughter instruction made no difference in the jury's verdict. The error was harmless even under the stricter *Chapman* "harmless beyond a reasonable doubt" standard. (*Chapman*, *supra*, 386 U.S. at p. 24.)

C. *Failure to Instruct on Nonstatutory Involuntary Manslaughter*

Sanchez contends the trial court had a sua sponte duty to instruct on the lesser included offense of nonstatutory involuntary manslaughter based on diminished actuality and its failure to do so constituted reversible error. Sanchez, however, fails to identify what instruction the court was required to give. The People claim the court provided such instruction via CALCRIM No. 3428 which informed the jury it could consider "mental disease, defect, or disorder" when determining whether Sanchez harbored the requisite specific intent for murder. The People assert a reasonable juror would have

23

understood it could find Sanchez guilty of involuntary manslaughter if it determined that he lacked malice at the time of the offense.

Under the doctrine of diminished actuality, a jury may "consider evidence of a mental disease, defect, or disorder solely for the purpose of determining whether [the defendant] 'actually premeditated, deliberated, harbored malice aforethought and/or intent to kill.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 556.)  CALJIC No. 3.32 is a correct statement of the diminished actuality doctrine.  (*Nelson, supra,* at p. 556.)  CALJIC No. 3.32 is the predecessor to CALCRIM No. 3428, which the jury received.[9]  (Judicial Council of Cal., Crim. Jury Instns. (Oct. 2024) Cor. 2, p. 1018.)  Accordingly, the jury was properly informed it could consider "mental disease, defect, or disorder" when determining whether Sanchez harbored the requisite specific intent for murder.

Even assuming the trial court erred in failing to give another instruction in addition to CALCRIM No. 3428, we would find the assumed error harmless.  By finding Sanchez guilty of premeditated murder, the jury

---

[9]     CALCRIM No. 3428 provided:  "You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder.  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically:  [¶]  In connection with the charge of First Degree Murder the People have the burden of proving beyond a reasonable doubt that the defendant acted wilfully, deliberately, and with premeditation and with malice aforethought.  If the People have not met this burden, you must find the defendant not guilty of First Degree Murder.  [¶]  In connection with the charge of Second Degree Murder the People have the burden of proving beyond a reasonable doubt that the defendant acted with malice aforethought.  [¶]  If the People have not met this burden, you must find the defendant not guilty of Second Degree Murder."

clearly dismissed any argument that the killing was unintentional. His first degree murder conviction proves beyond a reasonable doubt the court's failure to further instruct the jury on the doctrine of diminished actuality had no impact on the jury's decision. (*Chapman*, *supra*, 386 U.S. at p. 24.)

D. *Failure to Instruct on Voluntary Intoxication and Voluntary Intoxication Causing Unconsciousness*

1. Factual Background

Sanchez requested the court instruct on voluntary intoxication (CALCRIM No. 625) and voluntary intoxication causing unconsciousness (CALCRIM No. 626). Defense counsel argued the jury could find based on Dr. Kirkish's testimony regarding the effects of methamphetamine and Dr. Bosch's testimony that Sanchez smoked $20 worth of methamphetamine the evening before the stabbing, that the drug may have impacted him during the offense. The court declined to give the instructions finding insufficient evidence of voluntary intoxication or unconsciousness. Over the People's objection, the court instructed with CALCRIM No. 3425 regarding unconsciousness caused by an unsound mental condition not based on voluntary intoxication.[10]

---

[10]    CALCRIM No. 3425 provides: "The defendant is not guilty of First Degree Murder, Second Degree Murder, or Involuntary Manslaughter if he acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. [¶] Unconsciousness may be caused by unsound mental condition. [¶] The defense of unconsciousness may not be based on voluntary intoxication. [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious, unless based on all the evidence, you have a reasonable doubt that he was conscious, in which case you must find [him] not guilty."

25

2. Analysis

Sanchez claims the trial court erred by declining his request to instruct on voluntary intoxication and on unconsciousness due to voluntary intoxication. To support his contention that the evidence warranted giving CALCRIM Nos. 625 and 626, Sanchez relies primarily on statements he made to Dr. Bosch that the night before the crime he used $20 worth of methamphetamine and was out all night walking. Dr. Bosch opined that based on evidence Sanchez was seen talking to himself and making hand gestures, he likely committed the crime due to a drug-induced psychosis. She explained that a drug-induced psychosis can continue even though the drug is no longer in a person's system, stating in some cases a person can continue to experience some form of delusions or hallucinations for up to a year. Dr. Kirkish testified that methamphetamine could cause psychosis and worsen any kind of psychotic condition.

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) Based on section 29.4, CALCRIM No. 625 allows a jury to consider evidence of a defendant's voluntary intoxication in deciding whether the defendant

26

acted with an intent to kill or with deliberation and premeditation.[11] CALCRIM No. 626 provides that voluntary intoxication may cause a person to be unconscious of his or her actions, although still capable of physical movement. Unconsciousness caused by voluntary intoxication is not a complete defense to a criminal charge, but it may reduce some homicides to involuntary manslaughter. (*People v. Ochoa, supra,* 19 Cal.4th at p. 423;

---

[11] CALCRIM No. 625 provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant *<insert other specific intent required in a homicide charge or other charged offense>*.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of the defendant's voluntary intoxication for any other purpose."

CALCRIM No. 626.)[12]  Both instructions provide, "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect."  (CALCRIM Nos. 625, 626.)

A defendant is only entitled to a jury instruction on voluntary intoxication when there is substantial evidence both that the defendant was voluntarily intoxicated and this intoxication affected " 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677.)  Evidence of voluntary intoxication without any "evidence of its effect on a defendant's

---

[12]  CALCRIM No. 626 provides:  "Voluntary intoxication may cause a person to be unconscious of his or her actions.  A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.  [¶]  A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.  [¶]  When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.  [¶]  Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:  [¶]  1. The defendant killed without legal justification or excuse;  [¶]  2. The defendant did not act with the intent to kill;  [¶]  3. The defendant did not act with a conscious disregard for human life;  [¶]  AND  [¶]  4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] voluntary manslaughter)."

ability to formulate specific intent is insufficient to establish the defense." (*People v. Serrano* (2022) 77 Cal.App.5th 902, 918.)

Evidence of Sanchez's intoxication before killing Carol is scarce. Although he claimed to have taken $20 worth of methamphetamine the night prior, he offered no evidence showing how much he consumed or whether it could have affected him the next day. Sanchez's claim he walked all night does not suggest intoxication because Sanchez stated it was common for him to walk, he liked walking, and came home from the walk in a good mood. The only evidence suggesting possible intoxication came from Roberto, Senior's good friend. Roberto, however, testified inconsistently. He initially claimed that when Sanchez confessed to killing Carol, Sanchez "seemed normal" and had no difficulty speaking compared to other occasions when Sanchez did not appear normal. He later testified that, based on his experience with methamphetamine use and observing others under its influence, he believed Sanchez was under the influence when confessing to the crime.

Even crediting Roberto's conflicting testimony as substantial evidence showing Sanchez's voluntary intoxication, no evidence was adduced at trial demonstrating how that supposed intoxication resulted in Sanchez's inability to formulate the specific mental state necessary to establish deliberate and premeditated murder. Likewise, no evidence suggests Sanchez was unconscious of his actions, warranting an instruction on voluntary intoxication causing unconsciousness. Rather, shortly after the stabbing, Sanchez told Roberto he killed Carol using a screwdriver and knife and described her skin as "tough to pierce." These statements indicate Sanchez was conscious of his actions during the offense. Moreover, by finding Sanchez guilty of first degree murder on the ground he acted willfully, deliberately, and with premeditation, the jury necessarily determined Sanchez intended to

29

kill, which is inconsistent with the defense of unconsciousness. Accordingly, the trial court did not err in failing to instruct on voluntary intoxication or voluntary intoxication causing unconsciousness.

### III. *ALLEGED JUROR MISCONDUCT*

A. *Factual Background*

During guilt-phase deliberations, the court received a note from Juror No. 3 alleging that Juror No. 2, the foreperson, had been conducting research on schizophrenia and concluded the defendant was not mentally competent because she had read that schizophrenia causes aggression. The court excused Juror No. 2 over defense objection after individually questioning each juror and reviewing a copy of Juror No. 2's notes. After seating an alternate juror, the court instructed the jury to "return to the jury room and start your deliberations from the beginning." The jury found Sanchez guilty of first-degree murder on a Friday afternoon. The sanity phase began later that day.

On Monday, the court received a letter from former Juror No. 2 alleging that other jurors had been discourteous during deliberations and some were changing their vote "just to have a final verdict." Former Juror No. 2 wrote that one of the jurors complained of upcoming appointments and some jurors feared Sanchez. On Tuesday, when defense counsel asked the court about the letter, the court responded that it considered the matter over because former Juror No. 2 had been replaced. "If you want to talk to [former Juror No. 2] or you want to talk to the rest of the jurors, you can do so at the end of the trial."

Defense counsel asserted the court should hold an additional hearing. The prosecutor suggested having the parties or their investigators speak to the jurors after they rendered their sanity verdict. The trial court agreed with the prosecution, saying "we're not going to go through [an evidentiary

30

hearing] all over again." It suggested the parties have motions prepared and investigators ready to interview the jurors after they rendered their sanity phase verdict.

Following the sanity verdict, the court continued sentencing for two months to allow defense counsel to investigate juror misconduct for a possible new trial motion. On the new sentencing date, defense counsel requested an additional three week continuance to finish interviewing jurors and allow counsel to complete the new trial motion. The prosecution objected, and the court denied the request. The defense ultimately did not file a motion for new trial.

B. *Analysis*

Sanchez argues the court acted unreasonably by failing to investigate or make any type of inquiry after receiving former Juror No. 2's letter. He claims it would be serious misconduct if jurors adjusted their verdicts to fit their schedules, as they were instructed to base their decisions exclusively "on the evidence presented."

"A verdict reached by prejudicial juror misconduct must not be permitted to stand." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 385, citing § 1181, subds. (2), (3) & (4); Code Civ. Proc., § 657, subds. (1) & (2).) A criminal defendant may move for a new trial on specified grounds (§ 1181), including juror misconduct (*id.*, subds. (3) & (4)). Our Supreme Court noted that under the applicable federal standards, courts " ' "should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of . . . misconduct" ' " and a " ' "posttrial juror interrogation" ' " is required only when there is " ' "clear," "strong," and "incontrovertible" evidence" of alleged juror misconduct (*People v. Dykes* (2009) 46 Cal.4th 731, 810, fn. 23 (*Dykes*), quoting *U.S. v. Rosario* (2d Cir. 1997) 111 F.3d 293, 298–

31

299), or when the source of the allegations has sufficient credibility (*U.S. v. Angulo* (9th Cir. 1993) 4 F.3d 843, 847; *Dykes, supra*, at pp. 809–810, fn. 23). "The trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion." (*Dykes, supra*, at p. 810.)

Under these standards we discern no error in the trial court declining to conduct an evidentiary hearing based on the unsworn letter submitted by former Juror No. 2. When the evidence of juror misconduct is hearsay, a trial court generally acts within its discretion in denying an evidentiary hearing. (*Dykes, supra*, 46 Cal.4th at p. 810.) Moreover, since the jury had already reached a verdict in the guilt phase, the issue was whether juror misconduct had compromised the guilt phase verdict, warranting a new trial. Here, the court did not abuse its discretion when it determined the appropriate remedy was a motion for new trial after the sanity phase verdict. Had Sanchez prevailed on a new trial motion based on juror misconduct, this ruling would have necessarily vacated the jury's finding on the sanity phase.

## IV. *ALLEGED SANITY PHASE EVIDENTIARY ERROR*

A. *Factual Background*

On September 17, 2021, during the defense's presentation in the guilt phase of the trial, the prosecutor informed the court that a conditional examination of Dr. Bosch might be needed for the sanity phase. She stated that Dr. Bosch would be available the following week but would become unavailable after September 27, as she would be traveling out of state. The prosecutor stated that she tentatively planned to call Dr. Bosch as a witness during the guilt phase the following week. She requested the jurors be dismissed early to allow a video-recorded conditional examination of Dr. Bosch for the trial's sanity phase. The court did not view that as an issue and

32

informed defense counsel any objections could be addressed the following week.

A few days later, the prosecution filed a motion to conditionally examine Dr. Bosch. The prosecutor's affidavit stated Dr. Bosch would be in Maine on September 27, 2021, and it was "reasonably expected" that she would be unable to testify during the trial's sanity phase. Defense counsel noted that during the first trial the prosecutor made an oral motion for a conditional examination of Dr. Bosch because Dr. Bosch urgently needed to leave the state even though she was under subpoena. Defense counsel did not object during the first trial, and the court conducted a conditional examination, which was later played for the jury.

Defense counsel objected to another conditional examination of the same witness arguing, it was "extremely unlikely that the same expert would legitimately have the same urgent need in a retrial in the same case and under similar timing." Counsel suggested the prosecutor may have requested a conditional examination to gain a tactical advantage. Counsel noted the prosecutor's declaration did not provide any information other than Dr. Bosch's intent to leave the state, failed to state any urgent need, and did not reflect that the witness intended to violate a court order to appear. Should the court allow the conditional examination, defense counsel sought to question Dr. Bosch on her willingness to disobey a lawfully issued subpoena and to leave the state in violation of the court process, claiming this was relevant to her honesty and credibility.

The court allowed Dr. Bosch's conditional examination but denied defense counsel's request to question Dr. Bosch regarding her refusal to stay in the state. It commented, "So what am I supposed to do, Counsel? Let her go out of state? Just not finish the trial and have a mistrial?" Defense

33

counsel responded that she was unaware of Dr. Bosch's reason for leaving the state, whether she had been subpoenaed, or if she had informed the prosecutor she would be absent next week.  She argued Dr. Bosch's conditional examination was inadmissible under Evidence Code section 240 and the jury should be told Dr. Bosch intentionally refused to obey a lawful subpoena.  Counsel also pointed out that the court had not yet ruled on what would be allowed in the sanity phase, emphasizing that cross-examining the witness "in the dark" would severely hinder the defense.

The court, frustrated by the trial delays, remarked that it had been repeatedly assured there was enough time to complete the trial.  The prosecutor responded that the only requirement for a conditional examination is that the witness is about to leave the state, and once Dr. Bosch left, she would be unavailable, allowing her prior testimony to be used.[13]  The prosecutor argued that questioning Dr. Bosch about leaving the state would not affect Dr. Bosch's credibility or bias.  The court reaffirmed its ruling that the defense could not question Dr. Bosch regarding her unavailability.  Defense counsel requested a brief Evidence Code section 402 hearing to question Dr. Bosch about her refusal to comply with the subpoena, given the uncertainty over whether Dr. Bosch would delay her vacation.  The court denied the request, stating: "We're going to get this trial done."

The following day defense counsel informed the court that after the lunch break she saw Dr. Bosch in the hallway and jokingly told her, "I tried to keep you here next week."  Dr. Bosch told defense counsel she was going to Maine on vacation for her husband's birthday, and they "had it scheduled a couple of weeks ago, but we changed it."  Counsel renewed her objection that

---

[13]    As we will discuss, the prosecutor provided incorrect information to the court.

34

a vacation does not constitute good cause, stated Dr. Bosch "scheduled this, apparently being subpoenaed by the district attorney's office." Defense counsel believed the witness would stay if the court ordered her to do so.

The court questioned why a conditional examination would be difficult for the defense since it would be allowed to cross-examine the witness. Defense counsel pointed out the court had not yet ruled on what would be allowed in the sanity phase. The court indicated it would not change its ruling, and the defense objection would be ongoing. The court determined Dr. Bosch was a witness about to leave the state who would not be available the following week if they reached the sanity phase, and over defense objection it conducted a video-recorded conditional examination. Over defense objection, the court allowed the prosecution to play the video for the jury during the sanity phase of trial.

B. *Analysis*

Sanchez argues the prosecution did not exercise reasonable diligence in securing Dr. Bosch's testimony for the trial's sanity phase and the trial court violated his Sixth Amendment right to confront adverse witnesses and California law by ruling Dr. Bosch unavailable. We agree the prosecution failed to use reasonable diligence to secure Dr. Bosch's presence and find the error was not harmless beyond a reasonable doubt.

The state and federal Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.) The right of confrontation is not unlimited—an exception applies when a witness is unavailable, provided that the witness previously testified in a court proceeding against the same defendant and was subject to cross-examination. (*People v. Foy* (2016) 245 Cal.App.4th 328, 338 (*Foy*).) Sections 1335 and 1336 authorize conditional examinations of

witnesses in certain circumstances, including when the witness "is about to leave the state." (§ 1336, subd. (a).) "The defendant has the right to be present in person and with counsel at such examination. . . ." (§ 1340.) A video-recorded conditional examination may be shown at "trial if the court finds that the witness is unavailable as a witness within the meaning" of Evidence Code section 240. (§ 1345.)

Evidence Code section 240, subdivision (a)(4), provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." Evidence Code section 240, subdivision (a)(5), provides a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Although Evidence Code section 240, subdivision (a)(4) does not contain a " 'reasonable diligence' requirement, . . . unavailability in the constitutional sense nonetheless requires a determination that the prosecution satisfied its obligation of good faith in attempting to obtain [the witness's] presence." (*People v. Herrera* (2010) 49 Cal.4th 613, 622–623 (*Herrera*).)

In other words, the fact a conditional examination was taken does not mean that the transcript and videotape are automatically admissible at trial. It is "conditional" because its admissibility at trial is dependent on specified conditions, including unavailability. To be admissible at trial, the proponent of the evidence must also satisfy the requirements of the Confrontation Clause.

The constitutional right to confront witnesses requires that, before declaring a witness unavailable, "the prosecution must 'have made a good-faith effort to obtain his [or her] presence at trial.' " (*People v. Smith* (2003)

36

30 Cal.4th 581, 609 (*Smith*).) Accordingly, the proponent of the evidence has the burden of showing by competent evidence the witness is unavailable (*Foy, supra*, 245 Cal.App.4th at p. 339), and "that it made a 'good-faith effort' . . . or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sanchez* (2016) 63 Cal.4th 411, 440 (*Sanchez*).) The term "due diligence" cannot be precisely defined but implies persistent effort, genuine determination, and meaningful attempts to secure the witnesses' presence. (*Ibid.*) Key factors to consider include the promptness of the search, the significance of the witness's testimony, and the thoroughness of following potential leads. (*Ibid.*) Where, as here, the facts are not disputed, we independently determine the issue of due diligence. (*Smith, supra*, 30 Cal.4th at p. 610.) Exercising de novo review, we conclude the People did not use reasonable efforts to secure Dr. Bosch's attendance at the sanity phase of trial.

The record shows that Dr. Bosch testified under subpoena during the trial's guilt phase. At the conclusion of her guilt phase testimony, the court excused Dr. Bosch subject to recall and instructed her to not discuss her testimony until the conclusion of the matter. Knowing that Dr. Bosch intended to leave the state and would not be subject to recall, the trial court properly exercised its discretion to allow her to be examined conditionally. (*People v. Jurado* (2006) 38 Cal.4th 72, 114 [trial court has broad discretion to determine whether conditional examination of a witness is warranted].) The next step, which the court overlooked, is whether Dr. Bosch's conditional examination could be admitted at trial over Sanchez's objection that it infringed on his right to confrontation.

The People acknowledge that to satisfy a criminal defendant's Sixth Amendment guarantee to confrontation, a prosecution witness is unavailable

37

only if the prosecution made a good faith attempt to secure the witness's presence at trial. Yet they cite no evidence showing what efforts they undertook to secure Dr. Bosch's presence at the trial's sanity phase. Instead, the People note the uncertainty of when and if Dr. Bosch would have been required to testify because the guilt phase had not yet concluded.

While we agree securing Dr. Bosch's presence at the sanity phase presented some logistical challenges, the prosecution here made no attempt to secure her presence—such as asking Dr. Bosch if she could reschedule her trip. Nothing in the record suggests that had the prosecution undertaken *some* effort to persuade Dr. Bosch to testify that such efforts would have been unavailing. (*Ohio v. Roberts* (1980) 448 U.S. 56, 74 ["if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation"].)

Because Dr. Bosch remained under subpoena and her travel plans would have disobeyed the subpoena, the trial court should have undertaken some action to convince or compel her to testify. Our high court noted that "[c]ourts have admitted 'former testimony of a witness who is physically available but who refuses to testify (without making a claim of privilege) if the court makes a finding of unavailability only after taking reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing.'" (*Smith, supra*, 30 Cal.4th at p. 624; *People v. Sul* (1981) 122 Cal.App.3d 355, 365–366 [explaining to witness the possibility of being prosecuted for criminal contempt of court].) If Dr. Bosch refused to testify, the trial court could have issued an order to show cause for her appearance, and appointed counsel for her. (See *People v. Lawson* (2020) 52 Cal.App.5th 1121, 1126 [counsel appointed for victim of sexual assault who refused to testify a third time].) The trial court could then have considered her reasons

38

for refusing to testify and explored possible alternatives such as having the parties stipulate to allowing her to appear for the sanity phase remotely by video from Maine.

On this record, the trial court's admission of Dr. Bosch's conditional examination testimony violated Sanchez's Sixth Amendment confrontation rights. Sanchez contends the confrontation clause error merits reversal of the sanity phase verdict. The People maintain admission of Dr. Bosch's conditional examination, if found to be improper, was harmless beyond a reasonable doubt. We agree with Sanchez.

Under *Chapman, supra*, 386 U.S. 18, the beneficiary of a federal constitutional error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. (*Id.* at p. 24.) An error that did not contribute to the ensuing verdict is an error that is " ' "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.) Accordingly, reversal is required unless the record shows beyond a reasonable doubt that Sanchez was not prejudiced by the erroneous admission of Dr. Bosch's conditional examination. (*Ibid.*)

We assess whether a Confrontation Clause violation is harmless beyond a reasonable doubt by evaluating factors such as the significance of the witness's testimony to the prosecution, whether the testimony was merely repetitive, the existence of supporting or conflicting evidence on key issues, the scope of cross-examination allowed, and the overall strength of the prosecution's case. (*Foy, supra*, 245 Cal.App.4th at p. 351.) The People do

not address these factors and instead argue the circumstances of the offense were at odds with a claim of insanity.

We conclude the error was not harmless beyond a reasonable doubt. Two expert witnesses testified during the sanity phase—Dr. Clark for the defense and Dr. Bosch for the prosecution by way of the videotaped conditional examination. Since Dr. Bosch was the only prosecution witness in the sanity phase, her testimony was both non-repetitive and crucial to the prosecution's case. The key matters at issue were whether Sanchez had a mental disease or defect and because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong. (CALCRIM No. 3450.) On these key topics, the experts came to different conclusions.

Dr. Clark determined that Sanchez had a history of persistent mental health issues, including depression with psychotic features, schizoaffective disorder, and schizophrenia. She explained that goal-directed behavior can arise from both rational and irrational reasoning. She opined that on the day of the stabbing, Sanchez was experiencing command hallucinations involving Carol, had been battling the urge to resist them, and ultimately acted under their influence. Dr. Clark concluded that due to a mental disease or defect, Sanchez was incapable of knowing or understanding the nature and quality of his act, and he was not able to morally understand that what he had done was wrong at the time of the crime. Dr. Clark's testimony was further supported by significant other evidence of Sanchez's history of bizarre behavior, hearing voices, and mental health problems.

Dr. Bosch's conditional examination was the prosecution's only evidence at the sanity phase. When Dr. Bosch questioned Sanchez about

40

command hallucinations, he did not indicate hearing any voices before or during the stabbing. She determined that Sanchez was probably suffering from drug-induced psychosis during the incident. Dr. Bosch concluded that Sanchez recognized the wrongfulness of his actions and was not impaired to the extent he could not understand either the wrongfulness or the nature and quality of what he was doing.

On this record, we cannot conclude no reasonable jury could have found Sanchez insane. Without Dr. Bosch's erroneously admitted conditional examination, the jury could have accepted Dr. Clark's testimony and reached a different result in the sanity phase. Reversal of the sanity phase verdict is required because the People have not shown the confrontation clause error was harmless beyond a reasonable doubt.

## V. *CUMULATIVE ERROR*

Even if none of the errors individually requires reversal, Sanchez contends their combined effect rendered his trial fundamentally unfair. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

In our discussion of the guilt phase, we found three errors. We concluded the prosecutor's error in discussing the presumption of sanity was harmless based on the instructions given and the parties' arguments to the jury regarding Sanchez's mental state. (Above, pt. I.B.) We also concluded that any assumed error in failing to instruct on the lesser included offense of nonstatutory involuntary manslaughter based on diminished actuality, as well as the erroneous involuntary manslaughter instruction was harmless

41

under the "harmless beyond a reasonable doubt" standard. (*Chapman*, *supra*, 386 U.S. at p. 24.) (Above, pt. II.B & C.)

Having found these errors individually harmless, we reach the same conclusion when considering the errors together: " 'their cumulative effect does not warrant reversal of the judgment.' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 48.) We conclude Sanchez received a fair guilt phase trial that comported with due process and the two errors do not rise to the level of prejudice necessary to reverse Sanchez's guilt phase convictions.

DISPOSITION

The judgment is affirmed as to Sanchez's convictions, but the sanity phase verdict is reversed and the matter is remanded for a new sanity phase trial.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.